RENDERED: DECEMBER 16, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2018-CA-1818-MR

CURTIS CARTER APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
v. HONORABLE PAMELA R. GOODWINE, JUDGE
ACTION NO. 11-CI-01699

LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT APPELLEE

AND

NO. 2018-CA-1819-MR

ANN RATLIFF APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
v. HONORABLE PAMELA R. GOODWINE, JUDGE
ACTION NO. 11-CI-01699

LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT APPELLEE

AND

NO. 2018-CA-1820-MR

LARRY PRICE                                                                    APPELLANT


APPEAL FROM FAYETTE CIRCUIT COURT
v.         HONORABLE PAMELA R. GOODWINE, JUDGE
ACTION NO. 11-CI-01699


LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT                                                       APPELLEE

AND


NO. 2018-CA-1821-MR

DARRYL STEWART                                                           APPELLANT


APPEAL FROM FAYETTE CIRCUIT COURT
v.         HONORABLE PAMELA R. GOODWINE, JUDGE
ACTION NO. 11-CI-01699


LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT                                                       APPELLEE

AND


NO. 2018-CA-1822-MR

JACK BARNETT                                                                APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE PAMELA R. GOODWINE, JUDGE
ACTION NO. 11-CI-01699


LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT                                        APPELLEE

AND


NO. 2018-CA-1823-MR

JOHN BLEDSOE                                        APPELLANT


v. APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE PAMELA R. GOODWINE, JUDGE
ACTION NO. 11-CI-01699


LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT                                        APPELLEE

AND


NO. 2018-CA-1824-MR

ALEX HICKS                                        APPELLANT


v. APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE PAMELA R. GOODWINE, JUDGE
ACTION NO. 11-CI-01699

LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT                                          APPELLEE

AND


NO. 2018-CA-1825-MR

GENE L. BARRELL, JR.                                        APPELLANT


APPEAL FROM FAYETTE CIRCUIT COURT
v.          HONORABLE PAMELA R. GOODWINE, JUDGE
ACTION NO. 11-CI-01699


LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT                                          APPELLEE

AND


NO. 2018-CA-1826-MR

OMER COWHERD                                               APPELLANT


APPEAL FROM FAYETTE CIRCUIT COURT
v.          HONORABLE PAMELA R. GOODWINE, JUDGE
ACTION NO. 11-CI-01699


LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT                                          APPELLEE

AND

NO. 2018-CA-1827-MR

BRENT ROSS                                                          APPELLANT

                          APPEAL FROM FAYETTE CIRCUIT COURT
v.                    HONORABLE PAMELA R. GOODWINE, JUDGE
                              ACTION NO. 11-CI-01699

LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT                                                   APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  CALDWELL, COMBS, AND L. THOMPSON, JUDGES.

CALDWELL, JUDGE:  These appeals are from summary judgments granted on all

of Appellants' employment discrimination and related claims against Lexington-

Fayette Urban County Government ("LFUCG").  Despite the trial court's

commendable efforts to analyze the multitude of claims in detail in well-written

opinions, we are compelled to reverse and remand.

        Appellants are current or former employees of LFUCG's division of

Streets, Roads and Forestry ("SRF").  In 2011, Appellants filed a joint complaint

alleging discrimination on the basis of race, sex, and age; retaliation for reporting discrimination or otherwise exercising rights under the Kentucky Civil Rights Act ("KCRA"); and reprisal for reporting other types of wrongdoing in violation of the Kentucky Whistleblowers Act ("KWA"). Following discovery and extensive briefing, the trial court granted LFUCG's motions for summary judgment in its favor on all Appellants' claims.

## STANDARD OF REVIEW

We review the grant of summary judgment *de novo*. Viewing the evidence "to the benefit of the nonmoving party with all ambiguities resolved in its favor[,]" we consider whether the trial court erred in concluding no genuine issues of material fact existed and the moving party (LFUCG) was entitled to judgment as a matter of law. *The Board of Regents of Northern Kentucky University v. Weickgenannt*, 485 S.W.3d 299, 306-07 (Ky. 2016).

## OVERVIEW OF APPLICABLE LAW

In determining whether LFUCG was entitled to judgment as a matter of law, we apply authority construing the KCRA and the KWA.

The KCRA prohibits employment discrimination based on one's race, sex, or age over 40. KRS[1] 344.040(1). It also prohibits retaliation for reporting

---

[1] Kentucky Revised Statutes.

discrimination or otherwise exercising one's civil rights under the act. KRS 344.280.

The KWA prohibits state government employers' reprisals for employees' good-faith reporting or disclosing violations of law, waste and fraud, or mismanagement. KRS 61.102. The KWA also provides for a civil right of action to address violations of KRS 61.102. KRS 61.103(2).

Generally, Kentucky precedent recognizes that rights afforded under the KCRA and the KWA are similar to those in federal statutes. So, Kentucky courts follow federal case precedent in these areas. *See, e.g.*, *Weickgenannt*, 485 S.W.3d at 306; *Davidson v. Commonwealth, Dep't of Military Affairs*, 152 S.W.3d 247, 255 (Ky. App. 2004). But before we address the merits of Appellants' claims or principles about the employer's liability for individuals' actions, we first consider whether disciplinary proceedings before the LFUCG's Civil Service Commission ("Commission") barred further litigation of any claims or issues in court.

## I. Effect of Civil Service Commission Disciplinary Proceedings on Appellants' Claims – Issues of *Res Judicata* and Civil Service Commission's Authority to Hear KCRA Claims

Before Appellants filed suit, the Commission had held hearings about whether several Appellants should be subjected to discipline, including suspension or termination. None of these Appellants alleged discrimination or retaliation in

the Commission proceedings. Since these Appellants failed to allege discrimination or retaliation in Commission proceedings, LFUCG argued their discrimination and retaliation claims were barred by *res judicata*.

The trial court concluded that *res judicata* did not bar the claims of Brent Ross and Omer Cowherd, who had been reinstated to their positions after Commission proceedings. But it concluded *res judicata* barred some claims asserted by Appellants adversely affected by Commission proceedings – namely, Curtis Carter, Larry Price, and John Bledsoe[2] – due to their failure to allege discrimination or retaliation in the Commission proceedings.[3] In support for these conclusions, the trial court relied on *Welch v. Johnson*, 907 F.2d 714 (7th Cir. 1990), which we discuss later.

Within its discussion of *res judicata*, the trial court opined the Commission had the authority to consider allegations of discrimination or retaliation as objections or defenses in disciplinary proceedings. It rejected Appellants' arguments that the Commission lacked jurisdiction or authority to hear claims of discrimination or retaliation under the KCRA.

---

[2] Carter had appealed a suspension to the Commission, which affirmed the suspension. Price and Bledsoe were ultimately terminated as the Commission found they had been advised of their options after exceeding modified light duty limits but failed to exercise any of these options.

[3] Despite concluding that at least some claims were barred by *res judicata*, *res judicata* was not the sole basis for the trial court's granting summary judgment on any Appellant's claims and it addressed the merits of all claims.

-8-

## I. A.  Civil Service Commission Authority Regarding "Claims" of Discrimination or Retaliation

The trial court held the Commission had the jurisdiction or authority to hear discrimination or retaliation "claims" as an administrative agency "acting in a judicial capacity[,]" citing *Godbey v. University Hospital of Albert B. Chandler Medical Center, Inc*., 975 S.W.2d 104, 105 (Ky. App. 1998).  (Bledsoe/Price Summary Judgment, p. 4; Ross/Cowherd Summary Judgment, p. 5.)  Though the Commission acts in a quasi-judicial manner, we disagree with the trial court's reading of *Godbey* to mean LFUCG's Commission has authority to decide claims or causes of action for discrimination and retaliation under KRS Chapter 344.

*Godbey* recognizes that an administrative agency's quasi-judicial decisions may preclude further litigation of a particular issue actually decided by the administrative agency.  Since the fact-finder in a Workers' Compensation proceeding found the worker's injury was not caused by workplace exposure to chemicals, the *Godbey* Court determined the parties could not re-litigate this same issue in a tort action in court.  975 S.W.2d at 105-06.

But the *Godbey* opinion does not address any argument that the administrative agency lacked authority or jurisdiction to decide issues about injury causation.  And nothing in *Godbey* specifically relates to the authority of LFUCG's Commission to hear issues of discrimination or retaliation under the KCRA.

Although administrative agencies often can act in a quasi-judicial capacity, this power is limited by legislation. *Department of Natural Resources and Environmental Protection v. Stearns Coal & Lumber Co.*, 563 S.W.2d 471, 473 (Ky. 1978). Appellants argue that the Commission is limited to considering specific issues set forth in statutes and ordinances.

As noted by Appellants Ross and Cowherd, Section 21-44(c) of LFUCG's Charter[4] provides that in Commission disciplinary hearings, "the trial shall be limited to the issues presented by the written charges[.]" *See also* KRS 67A.280(3). Appellants also argue that, unlike the Lexington Human Rights Commission, the Civil Service Commission lacks express written authority to hear claims of discrimination and retaliation under the KCRA, citing KRS 344.300 to KRS 344.320 and generally to LFUCG's Code of Ordinances.[5]

---

[4] Chapter 21 of LFUCG's Charter provides a Comprehensive Plan for Classified Civil Service System, containing Section 21-44 cited in Ross and Cowherd's Appellant briefs and titled as referring to: "**Dismissal and other punishments; causes, charges, proceedings**." The parties have not discussed in their briefs any other LFUCG legislation about the respective powers and duties of LFUCG's Civil Service Commission and the Lexington Human Rights Commission.

[5] Albeit in an unpublished opinion, this Court previously determined that no statute or case law specifically required the Commission to consider alleged retaliation or discrimination as defenses in disciplinary proceedings and affirmed a Commission decision despite its refusal to hear evidence relating to discrimination or retaliation. But we did not discuss whether any ordinance or LFUCG Charter provision affected whether the Commission had to or might be permitted to consider such allegations.

In *Brown v. Lexington-Fayette Urban County Government Civil Service Commission*, No. 2011-CA-000248-MR, 2012 WL 752041 (Ky. App. Mar. 9, 2012), the Commission had refused to hear evidence about discrimination or retaliation in a disciplinary hearing. We upheld the Fayette Circuit Court's affirmance of the employee's termination upon judicial review –

-10-

In sum, neither party has cited any binding authority which specifically requires that allegations of discrimination or retaliation have to be heard in proceedings before the Commission.[6] And the Commission has at least on occasion declined to hear evidence about discrimination or retaliation in disciplinary proceedings – based on evidence presented by Appellants about a non-party employee's proceedings before the Commission as well as unpublished case law.[7]

In sum, while perhaps LFUCG's Commission may consider **issues** about alleged discrimination or retaliation as defenses in deciding whether

---

despite the employee's arguments of error based on the Commission's refusal to hear evidence about discrimination or retaliation or hostile work environment. We explained that the Commission's role was to determine if the rules of employment were broken, and that the Commission's findings on this matter were supported by substantial evidence. *Id*. at \*2-3. We further opined:

> the hearing before the [Commission] is limited to the issues raised by the written charges, which in this case consisted of five counts. KRS 67A.280(3). While evidence of discriminatory or retaliatory conduct of company officials could be considered by the [Commission] in its determination of whether Brown violated employment rules or procedures, there exists no statutory or case authority requiring the same. And, any allegations of discrimination and retaliation certainly stand as independent grounds for a wrongful discharge or civil rights action in state or federal court. To the extent these claims do not address the merits of the charges brought against Brown, neither the [Commission] nor the circuit court committed reversible error by failing to consider this alleged evidence.

*Id*. at \*3. The Kentucky Supreme Court denied discretionary review of our decision in *Brown*.

[6] Illinois authority regarding the Illinois Civil Service Commission's authority to consider issues of discrimination and retaliation cited in *Welch*, 907 F.2d at 723-25, is not binding here.

[7] *See Brown*, 2012 WL 752041.

-11-

discipline may properly be imposed, it is not required to do so.  And no one has cited any statute, ordinance, regulation, or other authority recognizing that LFUCG's Commission has the jurisdiction or authority to decide formal **complaints** or **charges** of discrimination or retaliation under the KCRA.

In contrast, courts and designated governmental agencies such as state and local human rights commissions have authority to hear complaints or charges of discrimination or other civil rights violations under the KCRA.  *See* KRS 344.200 (complaints of unlawful practices under the KCRA such as discrimination and retaliation may be filed with Kentucky Human Rights Commission); KRS 344.300-KRS 344.320 (regarding duties and responsibilities of local human rights commissions, including hearing violations of ordinances against discrimination); KRS 344.450 (civil cause of action in circuit court for violations of KCRA).

Thus, though LFUCG's Commission is not expressly prohibited from considering allegations of discrimination or retaliation as objections or defenses in disciplinary proceedings, the Commission has not expressly been granted the authority to hear claims – in the sense of formal requests for relief – under the KCRA and instead such claims must be litigated before other entities.

## I. B.  *Res Judicata*, Claim Preclusion, and Issue Preclusion

In holding that Bledsoe and Price's claims were barred by *res judicata* since they failed to allege discrimination or retaliation as defenses in the

Commission proceedings, the trial court cited in support a recent Fayette Circuit Court opinion (later vacated by this Court on other grounds)[8] and *Welch*, 907 F.2d at 714. *Welch* involved application of Illinois law regarding *res judicata. Id.* at 719-20. The Seventh Circuit concluded that *res judicata* barred plaintiff's discrimination claims because she failed to assert discrimination in challenging her termination before the Illinois Civil Service Commission and in state court proceedings. *Id.*

Naturally, Illinois law has no application here so we must consider binding Kentucky precedent concerning *res judicata*. Similar to Illinois authority cited in *Welch*, some Kentucky precedent indicates that *res judicata* bars further re-litigation not just of issues actually decided but also of issues which could have been asserted in a prior proceeding but were not. *See Combs v. Prestonsburg Water Co.*, 260 Ky. 169, 84 S.W.2d 15, 18 (1935).[9]

---

[8] The trial court cited a recent opinion by a different judge on the Fayette Circuit Court in *Ellis v. LFUCG*, Civil Action No. 97-CI-01882, on page 5 of the Ross/Cowherd summary judgment entered in February 2017. In 2019, this Court vacated the *Ellis* summary judgment (No. 97-CI-01882). *See Ellis v. Lexington-Fayette Urban County Government*, No. 2016-CA-000566-MR, 2019 WL 1224566 (Ky. App. Mar. 15, 2019). This Court concluded that the *Ellis* trial judge had improperly engaged in *ex parte* communications with LFUCG's counsel and entered LFUCG's proposed opinions and orders granting it summary judgment on plaintiffs' KCRA claims prior to a hearing on the motion. *Id*. at *3. Based on the record, this Court also found no reason to believe that the summary judgment granted was the product of the *Ellis* trial court's own deliberations rather than that of LFUCG. *Id*. at *4.

[9] As we recently discussed, pre-1970 references to *res judicata* in Kentucky case typically refer only to claim preclusion and different requirements for claim preclusion and issue preclusion are set forth in later precedent. *See Estate of Reeder v. Ashland Police Dep't*, 588 S.W.3d 160, 165 (Ky. App. 2019) (citing *Sedley v. City of West Buechel*, 461 S.W.2d 556, 559 (Ky. 1970)).

-13-

But more recent precedent indicates if different **claims** are decided in a prior proceeding, there is only a bar to re-litigating **issues** which were actually decided in the prior proceeding. This precedent distinguishes between two concepts often referred to as *res judicata*: claim preclusion and issue preclusion. *See Miller v. Administrative Office of Courts*, 361 S.W.3d 867, 871-72 (Ky. 2011). "Claim preclusion bars a party from relitigating a previously adjudicated cause of action and entirely bars a new lawsuit on the same cause of action" but issue preclusion only bars "the parties from relitigating any issue **actually litigated** and finally decided in an earlier action." *Id*. at 872 (emphasis added) (quoting *Yeoman v. Commonwealth, Health Policy Board*, 983 S.W.2d 459, 464-65 (Ky. 1998)).

Issues about discrimination or retaliation were not actually litigated before the Commission, even if it could have considered such issues. So, issue preclusion is not the relevant doctrine to apply here. Instead, we must consider whether claim preclusion applied here.

Obviously, claim preclusion depends on the same claim – or cause of action – having been decided in the prior proceeding. *See Miller*, 361 S.W.3d at 872. The trial court perceived that the Commission could hear "claims" of discrimination or retaliation as **defenses** in Commission proceedings.

If one defines a claim or cause of action as a basis to file a lawsuit or other formal complaint requesting relief, no claim of violations of KRS Chapter

344 in that sense was litigated before the Commission.[10] But even assuming that the Commission heard the same claims as those presented to the trial court, litigation about issues of discrimination or retaliation is barred only if these issues could have been heard by the Commission. *See Combs*, 84 S.W.2d at 18.

Even if the discipline imposed by the Commission must stand even after those decisions were either affirmed upon judicial review, or judicial review of those decisions was not sought,[11] many of Appellants' claims – including those of Carter, Bledsoe, and Price – concern other acts not related to disciplinary matters. For example, Appellants alleged, among other things, harassing acts not related to discipline which contributed to creating a racially hostile work environment. Therefore, prior Commission proceedings did not bar further litigation of Appellants' claims. In sum, under these facts, Appellants' failure to raise allegations of discrimination or retaliation as defenses before the Commission does not bar them from bringing those claims in these judicial proceedings.

---

[10] *See* definitions of *claim* and *cause of action* in BLACK'S LAW DICTIONARY (11th ed. 2019).

[11] Though we do not view *Welch* as controlling on *res judicata* due to its dependence on Illinois law, even *Welch* does not suggest that a disciplinary proceeding before the Illinois Civil Service Commission barred further litigation of discrimination claims not related to those disciplinary proceedings in court. *See Welch*, 907 F.2d at 722-23 (state court judgment affirming propriety of discharge resulted in *res judicata* barring claims related to the discharge proceeding, but it did not have *res judicata* effect on a separate failure to promote claim based on earlier events not related to the discharge proceeding).

## II.  Discrimination Claims

Next, we address Appellants' discrimination claims, beginning with claims of discrimination based on hostile work environment.  Appellants challenge the trial court's granting LFUCG summary judgment on their claims of four types of discrimination:  a) hostile work environment based on race, b) hostile work environment based on sex, c) gender-based discrimination relating to failure to promote, and d) age discrimination relating to failure to promote.

## II. A.  Claims of Hostile Work Environment Based on Race

In early 2009, several African-American SRF employees (including seven appellants) presented an informal document listing concerns, including racism and verbal abuse.  This document was presented to SRF management, to other city officials, and eventually to LFUCG's Human Resources ("HR") office.  Appellants contend that LFUCG's response was inadequate, that necessary corrective action was not taken, and that discrimination continued, including racial harassment.

## II. A. 1.  Employer Liability for Hostile Work Environment Based on Race

Before we address whether there is evidence of required elements of hostile work environment, we consider under what circumstances an employer can be held liable for individuals' harassing acts.  The Appellants alleged some racially harassing acts by co-workers and other racially harassing acts by supervisors.

Slightly different standards for employer liability apply to claims for hostile work environment created by co-workers versus hostile work environment created by supervisors. *Clark v. United Parcel Service, Inc*., 400 F.3d 341, 348 (6th Cir. 2005).

The employer's vicarious liability is the rule rather than the exception when a supervisor creates a hostile work environment – though without tangible employment action, the employer may be able to establish an affirmative defense. But a different standard applies for co-workers' actions. In that instance, the employer has to know or have reason to know of the harassment and fail to take action to be held liable for a co-worker creating a hostile work environment. *Id*. *See also Kirkwood v. Courier-Journal*, 858 S.W.2d 194, 199 (Ky. App. 1993) ("Sexual or racial harassment by a co-worker is not a violation of Title VII unless the employer knew or should have known of the harassment and failed to take action.").

If a supervisor harasses an employee without tangible employment action, the employer may escape vicarious liability by proving by a preponderance of the evidence: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington*

*Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). This method of escaping vicarious liability is often referred to as the "*Ellerth/Faragher* affirmative defense." *See, e.g.*, *American General Life & Acc. Ins. Co. v. Hall*, 74 S.W.3d 688, 692 (Ky. 2002).

The trial court held that LFUCG could not be held liable for much of the alleged racial harassment based on its determination that plaintiffs failed to report harassment – despite LFUCG's having an anti-harassment policy. But we have long held that not formally reporting harassment may not excuse an employer from liability for harassment when there is evidence that the plaintiffs informally told supervisors about harassment by co-workers or that supervisors were among the harassers. *See Kirkwood*, 858 S.W.2d at 199 (rejecting employer's argument it could not be held liable for conduct it characterized as unreported given plaintiff's testimony about informing supervisors of co-workers' harassment and about supervisors being among the harassers).

The trial court held that the informal memorandum by the seven African-American Appellants here – which evidence shows was circulated to the SRF director and deputy director as well as other LFUCG officials and eventually HR – did not effectively report racial harassment. And the trial court held that the memorandum's reference to racism did not specifically report racial harassment.

However, construing evidence in the light most favorable to Appellants, the references to both racism and verbal abuse on the list of serious problems in SRF could encompass the use of racial slurs, or other types of verbal harassment. Also, according to Appellants' deposition testimony, general claims of "racism" on the informal written document were fleshed out as claims of racial harassment during verbal communications with HR.

The trial court discounted Appellants' assertions that they verbally discussed incidents of racial harassment, including racial slurs, with HR based on HR notes of interviews. The court relied on the fact that at the end of most sets of HR notes was a signed statement by each appellant – on a separate page – stating the "information contained in this interview" was true and accurate. (Record on Appeal, "R.," p. 899.) But this statement did not also recite that the notes contained a complete listing of everything verbally discussed.

Furthermore, many Appellants testified they were asked to sign these statements without being able to review HR's notes. They believed they were just signing to confirm that everything they orally said in interviews was true and accurate. Though HR representatives may have disagreed with such assertions in their testimony, this reflects factual disputes – not an impossibility that Appellants could persuade a fact-finder they informally reported harassment to LFUCG.

The trial court also rejected the plaintiffs' claims that LFUCG ineffectively responded to reports of racial harassment, since LFUCG conducted an investigation and determined it could not substantiate many of the claims. However, LFUCG's internal determination of lack of substantiation is not necessarily dispositive – especially given conflicts in the evidence and HR representative Ashley Case's testimony identifying some potential problems with investigations. For example, she testified that if not corroborated by multiple other employees, an employee's allegation was previously considered unsubstantiated – making it impossible for harassment directed solely at one person and not witnessed by others to be substantiated.

Furthermore, an investigation by an employer does not always mean it escapes liability for harassment if it investigates and finds allegations unsubstantiated. The employer might be liable if the investigation was defective or conducted in bad faith. *See Forsythe v. Wayfair Inc.*, 27 F.4th 67, 74-75 (1st Cir. 2022) (though employer not subject to liability under facts of that case, noting it was not the sort of case where the employer simply asked the accused about the allegations and then blindly accepted his/her denials).

Viewing the evidence in the light most favorable to the non-moving parties, we conclude the trial court's determination that LFUCG could not properly be held liable for any individual's racially harassing conduct is error.

**II. A. 2.  Requirement of Severe or Pervasive Conduct for Hostile Work Environment Claims in Context of Alleged Racial Harassment**

Our Supreme Court defined *hostile work environment* as meaning: "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ammerman v. Board of Educ. of Nicholas County*, 30 S.W.3d 793, 798 (Ky. 2000).  *See also Lumpkins ex rel Lumpkins v. City of Louisville*, 157 S.W.3d 601, 605 (Ky. 2005) ("hostile work environment discrimination must be severe or pervasive and more than episodic"). Obviously, severe or pervasive harassing conduct is a key element of hostile work environment claims.  Before addressing other elements of hostile work environment claims, we consider recent federal precedent and long-standing Kentucky state precedent on questions of severity or pervasiveness of harassment. Ultimately, we conclude the trial court failed to follow precedent showing that a supervisor's calling an employee the N word is inherently serious conduct.

While the last couple of motions for summary judgment were pending, and before final judgment was entered, the plaintiffs jointly filed a motion for the trial court to supplement the record and to reconsider prior rulings in light of *Castleberry v. STI Group*, 863 F.3d 259 (3d Cir. 2017) – attaching a hard copy of this opinion to their motion.  Appellants have argued that *Castleberry* made clear they were not obliged to prove both severe **and** pervasive conduct to succeed

on hostile work environment claims – but only severe **or** pervasive conduct.  They also cite *Castleberry* to argue that an isolated incident can be sufficient to create a hostile working environment if extremely serious.  *See id*. at 264-65.  And they argue that *Castleberry* demands that incidents involving the use of racial slurs, such as the N word, must be regarded as extremely serious.

In *Castleberry*, the Third Circuit reversed the trial court's granting of a motion to dismiss for failure to state a claim.  It held an alleged isolated incident, by itself, consisting of a supervisor's referring to plaintiffs as "N—ers," coupled with threats of termination, would amount to severe conduct which could create a hostile work environment.  *Id*. at 265.[12]  Appellants argued to the trial court that each of them had been subjected to acts which exceeded the isolated incident in *Castleberry* in terms of severity.  The isolated incident in *Castleberry* involved a supervisor's telling the plaintiffs that if they had "N—er-rigged" a fence, they would be fired.  *Id*. at 262.

Although the trial court here noted it read *Castleberry*, it stated *Castleberry* did not affect its rulings.  It found *Castleberry* distinguishable because

---

[12] *Castleberry* also held that plaintiffs' allegations of sign-in sheets bearing racially discriminatory statements on several occasions – as well as members of their race receiving more menial and less complex job assignments than White employees – could possibly satisfy the alternative requirement of pervasive conduct.  *Id.* at 265-66.  In short, it held that plaintiffs stated a claim for racially hostile work environment based on either severe or pervasive conduct – though it reserved questions of whether the allegations were true or whether the conduct could be considered sufficiently pervasive to be resolved following discovery.  *Id.* at 266.

it found no indication in *Castleberry* that the employer conducted an investigation – thus, perhaps alluding to considerations of whether the employer could be held liable for individuals' actions. Despite the trial court's distinguishing *Castleberry* on the basis of lack of employer investigation of harassment allegations, *Castleberry* did not explicitly discuss whether there was any investigation or basis for the employer to be held liable for individuals' actions. Instead, it simply assessed whether plaintiffs stated a claim for racially hostile work environment in ruling on a motion to dismiss.

Appellants have argued the trial court erroneously interpreted precedent as requiring that plaintiffs show severe *and* pervasive conduct to establish a hostile work environment. Regardless of the holding of *Castleberry*, Kentucky precedent already requires only severe *or* pervasive conduct as one element of a hostile work environment. *See Lumpkins*, 157 S.W.3d at 605; *Ammerman*, 30 S.W.3d at 798.

Though Kentucky courts may not yet have logically extended the severe or pervasive conduct requirement to explicitly recognize that one isolated incident could create a hostile work environment if sufficiently serious, some federal courts have. For instance, *Castleberry* clearly indicates that one isolated serious incident of harassing conduct – such as a supervisor's using a racial slur along with threats of termination – may be enough to create a hostile working

environment. Similarly, a recent Fifth Circuit case held that a plaintiff's complaint alleging a single incident in which his supervisor referred to the plaintiff as a "Lazy Monkey A— N—er" in the presence of other employees "states an actionable claim of hostile work environment." *Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022).[13]

Despite this recent federal precedent holding a hostile work environment can be created by one isolated incident of a supervisor referring to an employee as a N—er, prior precedent did not always reflect this view. *See Lumpkins*, 157 S.W.3d at 607-08 (Cooper, J., dissenting) (claiming law is clear that one isolated incident – even involving use of racial slurs such as "the N word" – is not enough to create a hostile work environment and arguing jury may have improperly based its verdict on one undisputed isolated incident). In fact, though perhaps no binding Kentucky precedent directly states that one isolated incident could never create a hostile work environment, our Supreme Court previously appeared hesitant to recognize that a viable hostile work environment claim could be based solely on one isolated incident. *See Lumpkins*, 157 S.W.3d 605-06 (noting employer argument that jury verdict for plaintiffs on racially hostile work environment claim may be based on one isolated incident but affirming due to evidence of multiple acts of harassment); *Ammerman*, 30 S.W.3d at 799 (noting

---

[13] We recently granted Appellants' motion to supplement their briefs with *Woods v. Cantrell*.

lack of authority that one isolated incident could create a sexually hostile work environment).

Thus, we cannot simply follow *Castleberry* or *Cantrell* to declare that one isolated incident may create a hostile work environment if sufficiently serious. Instead, we must leave it to the Kentucky Supreme Court to address whether the severe **or** pervasive conduct requirement can be logically extended to recognize hostile work environments created by one isolated, extremely serious incident. *See* SCR[14] 1.030(8)(a).

However, no Appellant claims hostile work environment based solely on any one isolated incident. And we are mindful that in assessing whether a hostile work environment exists, one must look at the totality of the circumstances and must consider the combined effect of seemingly isolated incidents of harassment. *See Lumpkins*, 157 S.W.3d at 605 ("Whether a work environment is hostile is determined on the totality of the circumstances and juries should not be encouraged to disaggregate individual circumstances.").

Furthermore, the existence of a hostile work environment may depend not on pervasive conduct but instead on severe conduct. And *Castleberry* and *Cantrell* are also instructive on assessing the severity of conduct in a manner consistent with Kentucky state precedent.

---

[14] Kentucky Rules of Supreme Court.

*Castleberry* and *Cantrell* suggest that in assessing the **severity** of alleged conduct, a supervisor's referring to employees as N—ers strongly points toward extremely serious conduct – which is consistent with Kentucky precedent in our view. Though our Supreme Court did not explicitly discuss if use of the N word was especially egregious in *Lumpkins*, it noted evidence of the direct supervisor's use of racial slurs and recognized the discrimination inherent in referring to adult male African-Americans as "boys." 157 S.W.3d at 606.

Our Supreme Court also noted that the employer objected to the instructions given by the trial court on the basis that the jury might return a verdict favorable to the plaintiffs based solely the undisputed "August 11th confrontation." This August 11th confrontation consisted of the plaintiffs' direct supervisor yelling at them, calling them "N—ers," wrongfully accusing them of vandalism, and telling them they were fired, in front of a large number of people at the pool where they worked. *Id.* at 604. The Kentucky Supreme Court did not expressly discuss whether this one incident by itself could be considered extremely serious or forthrightly declare that this incident alone could have created a hostile work environment. Yet this August 11th incident in *Lumpkins* clearly resembles the isolated incident which the Third Circuit indicated was extremely serious and might by itself demonstrate severe conduct in *Castleberry.* After all, both involved use of the N word along with threats of termination. And though our Supreme

Court appeared reluctant to state one extremely severe incident could create a hostile work environment, its discussion of the impact of racist language and its reinstatement of the jury's verdict in *Lumpkins* indicates that a supervisor's usage of the N word in referring to employees is a very serious matter – consistent with *Castleberry* and *Cantrell*.

In sum, even if Appellants were not otherwise entitled to relief from the trial court's denying their motion to supplement the record and to reconsider summary judgments[15] in light of *Castleberry*, a supervisor's referring to employees by using the N word must be regarded as extremely serious conduct. The trial court erred in not viewing evidence of supervisors' using racial slurs and/or condoning subordinates' usage of racial slurs as evidence of extremely serious conduct.

---

[15] In a practical sense, though the trial court ostensibly denied the motion to supplement the record, a hard copy of the *Castleberry* opinion became part of the record when submitted as an exhibit to the motion. And the trial court acknowledged it read *Castleberry*. We review the trial court's application of *Castleberry* and of other legal authority *de novo*. *Commonwealth v. Pridham*, 394 S.W.3d 867, 875 (Ky. 2012). As for the motion for reconsideration, we construe that as a motion to alter, amend, or vacate under Kentucky Rules of Civil Procedure ("CR") 59.05. *See generally Cloverleaf Dairy v. Michels*, 636 S.W.2d 894, 895-96 (Ky. App. 1982). Our precedent indicates that while the denial of such a CR 59.05 motion is not itself appealable, we should simply consider the appeal to be taken from the final judgment – here the finalized grant(s) of summary judgment – challenged by the CR 59.05 motion. *Ford v. Ford*, 578 S.W.3d 356, 365-66 (Ky. App. 2019).

**II. A. 3. Evidence of Harassment Towards Others of Same Protected Class (Race) to Support Racially Hostile Work Environment Claims**

In addition to declining to reconsider in light of *Castleberry*, in deciding whether each individual Appellant offered proof of severe or pervasive conduct, the trial court also disregarded evidence of harassment directed at other African-American employees. Appellants argued that Sixth Circuit precedent required consideration of all acts of harassment directed towards African-American employees in considering whether a racially hostile work environment was created under the totality of the circumstances. *See Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999); *Berryman v. Supervalu Holdings*, 669 F.3d 714 (6th Cir. 2012).

In *Quanex*, the Sixth Circuit held that the trial court erred in granting judgment for the employer by excluding evidence of racial harassment not directed at or witnessed by the plaintiff, especially since the plaintiff offered evidence of her awareness of acts directed toward other individuals:

> Given that analysis of this claim required a consideration of all of the circumstances, the district court committed error when it deemed irrelevant the overwhelming evidence Jackson proffered documenting discriminatory conduct towards other African-American employees at Quanex. . . . [A]n employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself. . . . Evidence of racist conduct affecting African-American employees certainly mattered as to

whether the work environment at Quanex was objectively hostile to African Americans, and evidence that Jackson learned of these incidents clearly demonstrated that, as an African American, she subjectively perceived that her work environment was one hostile to her.

191 F.3d at 660-61.[16]

Citing *Quanex*, the Sixth Circuit later affirmed a summary judgment granted in favor of the employer. It held that multiple employee plaintiffs were not entitled to consideration of evidence of acts directed towards their co-plaintiffs since they did not offer evidence of their awareness of these acts. *Berryman*, 669 F.3d at 718-19.

As of September 2022, *Berryman* has not been cited in any published Kentucky state case. Furthermore, its requirement that plaintiffs must affirmatively present evidence of their awareness of harassing acts directed toward others for such acts to be considered to support their own hostile work environment claims may not be consistent with our Supreme Court's discussion in *Lumpkins*.

In fact, *Lumpkins* calls for consideration of harassing acts directed at others of the same protected class – without explicitly requiring that plaintiffs present affirmative evidence of their being aware of such acts directed at others.

---

[16] Albeit in unpublished cases, *Quanex* has been cited by this Court to recognize that evidence of a plaintiff's secondhand awareness of harassment directed towards others of the same protected class should be considered to support hostile work environment claims. *See Morton v. United Parcel Service, Inc.*, No. 2017-CA-001802-MR, 2019 WL 3059899, at * 4 (Ky. App. Jul. 12, 2019); *Yancey v. Sheriff of Jefferson County*, Nos. 2002-CA-000229-MR & 2002-CA-000293-MR, 2004 WL 323352, at * 6 (Ky. App. Feb. 20, 2004).

157 S.W.3d at 605 (noting jury should not be directed to "disaggregate" individual circumstances when assessing whether a hostile work environment was created). Though the facts of *Lumpkins* may suggest that the plaintiffs had some awareness of some acts directed at co-plaintiffs,[17] the opinion does not discuss whether all plaintiffs were aware of all acts directed toward co-plaintiffs.

Given our Supreme Court's directives in *Lumpkins*, the trial court erred in refusing to consider evidence of acts of racial harassment directed at other plaintiffs of the same protected class and in concluding that no plaintiff could succeed in proving his racially hostile work environment claims.

## II. A. 4. Requirements that Harassment be Objectively and Subjectively Offensive for Claims of Hostile Work Environment

Not only must harassing conduct be severe or pervasive to create a hostile work environment, but "the harassment must also be both objectively and subjectively offensive as determined by looking at all the circumstances." *Ammerman*, 30 S.W.3d at 798 (internal quotation marks omitted). Relevant circumstances "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

---

[17] The three plaintiffs in *Lumpkins* worked as lifeguards at Louisville city pools over the same summer and were typically assigned to pools in African-American neighborhoods. 157 S.W.3d at 603. The three had the same direct supervisor and were present during the undisputed August 11th incident. *Id.* at 604.

Appellants provided ample testimony about racially offensive comments and conduct at their workplace. Appellants testified to the use of racial slurs like the "N word" or "coons," often by co-workers in the presence of supervisors – the same supervisors who failed to take any action even when Appellants complained of being offended by such language.

Some Appellants also testified to their supervisor, Robert Bishop, referring to some employees as "N—ers" and bragging about how he was the one being promoted despite having less experience. Similarly, some testified to Bishop and others making fun of the (at that time) sole African-American supervisor, Henry Lacy – and to Bishop's saying Lacy would only be welcome at Bishop's house as a lawn jockey. Some testified to Lacy's generally being treated with derision and disrespect by White supervisors. Bishop and other supervisors denied many of these alleged acts in their testimony.

Some Appellants also testified to seeing Confederate flags in a co-worker's photo album open in the workplace or on a co-worker's license plate, and to seeing swastikas repeatedly appearing on bathroom walls despite continuing efforts to paint over them. These Appellants also testified to being aware of racial connotations to these symbols, being offended by such symbols, and observing a lack of effective action by management to combat such offensive displays. For

example, some testified that it took years for LFUCG to offer racial harassment training despite recurring instances of racially offensive displays.

Appellants also offered testimony that some co-workers had said it was "assassination time" in response to the election of President Barack Obama (the first African-American President of the United States) in 2008. Also, some Appellants testified about African-American employees' being subjected to non-verbal acts of physical aggression – though LFUCG contends that much of this was mere horseplay and/or occurred outside the statute of limitations.

The trial court frequently dismissed the Appellants' deposition testimony about racial slurs and other harassment if such testimony was otherwise "uncorroborated" by others. Testimony such as that offered by Carter about racial slurs and Stewart's testimony about hearing a supervisor refer to a co-worker as a "N—er" was disregarded. This was error, as this sworn deposition testimony of record – even if disputed by others' accounts – at least reflects factual disputes.[18]

---

[18] The trial court remarked that Carter's deposition testimony was "uncorroborated" and that one could not get past summary judgment without significant evidence. The trial court even stated that instead of relying on evidence, Carter relied on his own deposition testimony. (Carter Summary Judgment, p. 16.) As authority, the trial court quoted *Wymer v. JH Resources, Inc.*, 50 S.W.3d 195 (Ky. 2001): "The party opposing summary judgment cannot rely on their own claims or arguments without significant evidence in order to prevent a summary judgment." *Id.* at 199. But *Wymer* did not discuss any deposition testimony or other testimony which was not corroborated by other evidence – instead, it discussed how the plaintiff had brought forth **no** evidence to support a key element of her claim and how she admitted she could not perform the duties of her job. *See id*. at 199-200 (plaintiff presented no evidence of termination in retaliation; instead evidence showed that she was terminated because she admittedly could not perform duties of job). Though deposition testimony is not always presented at trial, sworn deposition testimony made part of the record is something the trial court must review to see if there exist

The trial court also erred in simply accepting some witnesses' denials of some events (such as a witness's being subjected to racial slurs at the workplace) rather than recognizing that genuine issues of material fact existed in light of conflicts with other testimony. A court is not to weigh evidence and assess credibility at the summary judgment stage since it should not decide any issues of fact at that point, but it should simply examine the evidence to see if issues of fact exist. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). Faced with a motion for summary judgment, a court must weigh the evidence in the light most favorable to the non-moving party and assess whether it would be impossible for the non-moving party to prevail. *Id*. at 482-83. If evidence is disputed, as here, it would not be impossible for the non-moving party to prevail as the jury could choose to believe the non-movants' version of events.

Though proving some claims at trial may be difficult given conflicts in the evidence, such as others' denials, sworn deposition testimony must still be considered in ruling on summary judgment motions. CR 56.03. For example, though a co-worker and supervisor dispute Stewart's testimony about the use of a racial slur, this does not mean that Stewart could not prevail. Instead, a reasonable jury might conclude that one had simply forgotten or never heard certain remarks,

material issues of fact and/or if the movant entitled to judgment as a matter of law. CR 56.03. Sworn deposition testimony, in short, is substantial evidence.

-33-

or were lying, or that Stewart accurately remembered the use of a racial slur but was confused about whom it was directed toward. And again, the evidence must be construed in the light most favorable to the non-moving party for purposes of summary judgment.

Furthermore, though we must leave it to our Supreme Court to ultimately clarify whether one extremely serious isolated incident may ever amount to actionable hostile work environment, Appellants offered evidence of at least one incident which might reasonably be regarded as extremely serious. In particular, testimony about supervisor Bishop's referring to employees as "N—ers" and bragging about how he obtained promotions over more experienced African-American employees in front of multiple employees could be construed as an "extremely serious" incident. Not only was a particularly offensive racial slur allegedly used in a humiliating manner given the audience, but it could also be construed as celebrating racial discrimination.

Also offering evidence of other incidents of harassment including other racial slurs and frequent use of racially offensive symbols in the workplace, Appellants demonstrated at least triable issues on whether severe or pervasive conduct occurred resulting in a hostile work environment. *See Lumpkins*, 157 S.W.3d at 606 (finding sufficient evidence to support jury verdict in plaintiffs' favor based on evidence of undisputed incident combining racial slurs with

unfounded accusations and terminations, along with evidence of other instances of racially harassing conduct).

Again, our Supreme Court has indicated that even where some incidents of harassment might not be enough by themselves to constitute a hostile work environment, such incidents must not just be viewed in isolation. Instead, the combined effect of such incidents must be considered when judging whether a hostile work environment was created. *Lumpkins*, 157 S.W.3d at 605.

The trial court erred in dismissing hostile work environment claims based on each individual incident's not constituting a hostile work environment by itself, rather than properly considering the combined effect of such incidents together. Although some of the incidents to which the Appellants testified might not be sufficient by themselves to create an actionable hostile work environment, the evidence presented of multiple incidents of harassment, including supervisors' usage of egregious, extremely offensive racial slurs, was sufficient to at least create triable issues of fact about severe or pervasive conduct.

## II. A. 5. Requirement That Harassment Be Based on Race for Claims of Hostile Work Environment Based on Race

Next, we address whether evidence of other required elements of racially hostile work environment was presented. In addition to a basis for holding the employer liable for either severe or pervasive conduct, a viable racially hostile work environment requires proof of additional elements, including that the

harassment was based on race. *Beatty v. Frito-Lay, Inc.*, 429 F. Supp. 3d 342, 347 (E.D. Ky. 2019) (listing required elements of racially hostile work environment in KCRA case). *See also Gray v. Kenton County*, 467 S.W.3d 801, 805 (Ky. App. 2014) (in hostile work environment based on sex case, indicating a hostile work environment claim requires showing, among other elements, that the harassment was based on one's protected class).

The trial court concluded that some Appellants failed to show that any harassment occurred due to their race. Though evidence of some alleged incidents of racial harassment did not involve explicit reference to race or the usage of racial slurs, Kentucky precedent requires that all evidence be construed in favor of non-moving parties and that all doubts be resolved in their favor when ruling on a motion for summary judgment. *See, e.g.*, *Weickgenannt*, 485 S.W.3d at 307.

Despite lack of explicit reference to race in some alleged harassing speech and conduct, a reasonable fact-finder might still infer a racial basis for some of the complained-of speech and conduct. *See Quanex*, 191 F.3d at 661-62 (noting that evidence of conduct not involving explicit use of racial slurs or racist language could be considered as part of the totality of the circumstances and one could not just assume conduct was not racially motivated based solely on lack of explicit racial language). Construing the evidence in the light most favorable to Appellants, we conclude there were triable issues of fact on whether various

incidents of alleged harassment occurred on the basis of race. Furthermore, construing the evidence in the light most favorable to Appellants, there is evidence supporting other required elements of a racially hostile work environment, including subjective perception of harassment and circumstances objectively supporting a hostile work environment. *See Beatty*, 429 F. Supp. 3d at 347.

Each Appellant here, who asserted claims for a racially hostile work environment, provided testimony about his awareness of racial slurs or other harassing conduct directed at himself and/or others and his subjective perception of this as offensive and unwelcome harassment. And properly considering the cumulative effect of incidents of harassment for which evidence was offered, the trial court erred in granting LFUCG summary judgment based on the evidence not objectively demonstrating a hostile work environment.

Therefore, viewing the evidence in the light most favorable to Appellants, there were at least genuine issues of material fact on each required element of racially hostile work environment claims and LFUCG was not entitled to judgment as a matter of law. *See* CR 56.03; *Steelvest*, 807 S.W.3d at 480. Thus, we conclude that the trial court erred in granting LFUCG summary judgment on Appellants' claims of a racially hostile work environment.[19]

---

[19] The trial court also perceived that Appellants alleged claims for other types of racial discrimination in addition to a racially hostile work environment – such as disparate treatment and/or failure to promote. After detailed analysis, it concluded that LFUCG was entitled to

## II. B.  Hostile Work Environment Based on Sex Claims

Next, we address Gene Barrell's and Darryl Stewart's claims of

hostile work environment based on sex.  According to deposition testimony,

Robert Bishop, the direct supervisor of Stewart and Barrell, engaged in

inappropriate workplace conduct.  This conduct included patting Barrell's

posterior; making lewd gestures, such as Bishop's grabbing his own crotch; and

making comments about Barrell's being Bishop's "bitch," and directing Barrell to

suck Bishop's "dick" on an unspecified number of occasions.  Stewart also

testified to seeing Bishop make "humping" motions simulating sexual activity

behind Barrell's back.  (Barrell did not testify in his deposition about Bishop

making the humping motions, although he stated in a written document in the

record that other employees had told him about this happening.)  Bishop denied

making lewd comments and gestures in his deposition testimony, although he

admitted to once yelling at people to get the f— out of his office.

According to Stewart, he told SRF Deputy Director Miller and

Director Williams about Bishop's treatment of Barrell, including the lewd

comments and gestures, and neither Miller nor Williams did anything other than

---

summary judgment on these other types of racial discrimination claims because Appellants could not prove requisite elements such as adverse employment action or sufficiently similar comparators.  Appellants' briefs do not clearly argue error in the trial court's analysis on these other types of racial discrimination claims – for example, they do not argue that comparators were sufficiently similar.  Instead, they focus their arguments on their racially hostile work environment claims which, they note, do not require a showing of adverse employment action.

say that should not happen or there were two sides to every story. Miller and Williams did not report the allegations of sexual harassment to HR, despite their duty to do so, according to HR representative Ashley Case's testimony.

Case testified that, based on HR records, Stewart orally told HR representative Philip Burbage about the harassment in about February 2009. Burbage conducted an "informal" investigation but apparently did not make any documentation. During this initial informal investigation, Barrell indicated he did not perceive, at the time, the posterior-patting as anything other than a coach-like gesture of approval and he denied some of Stewart's allegations. However, Case acknowledged that Burbage did not specifically ask Barrell about all alleged comments by Bishop, contrary to best HR practices.

According to Barrell and Stewart, despite their informal reporting efforts, Bishop's lewd behavior towards Barrell continued. Stewart filed a formal sexual harassment charge in fall 2009. The Equal Employment Opportunity Commission ("EEOC") found probable cause that sexual harassment occurred, although it declined to file suit. Barrell cooperated with the investigation and later joined Stewart in alleging that Bishop had directed harassing acts towards Barrell. (Barrell claims in his brief that he had simply tried to give Bishop the benefit of the doubt in early 2009, but that continued harassing acts changed his mind about

Bishop.)  Eventually Barrell and Stewart were transferred to working under a different supervisor.

Some evidence indicates that Stewart and Barrell brought alleged harassment to the attention of HR representative Burbage, Miller, and Williams well prior to Barrell's formal written grievance in the fall of 2009 – even though Barrell initially denied some allegations by Stewart when questioned by Burbage in early 2009.  Evidence of Barrell's initially denying some of Stewart's allegations adds to, rather than disproves, the existence of genuine issues of material fact – particularly since the evidence must be considered in the light most favorable to the non-moving party in considering summary judgment.

**II. B. 1.  Principles of Employer Liability – Hostile Work Environment (Sex)**

Barrell and Stewart did not pinpoint exactly when various instances of harassment occurred in their deposition testimony.  But we cannot share the trial court's view that the evidence conclusively showed that no harassing acts occurred after harassing conduct was reported.  Instead, viewing the evidence in the light most favorable to Barrell and Stewart, questions of fact exist whether harassing acts continued after Barrell and Stewart formally or informally reported harassment.  This is true whether the reporting was by orally advising Burbage, Miller, or Williams, and/or by formally filing complaints of harassment internally (to HR) or externally with other government agencies.

Furthermore, precedent does not necessarily require that harassing conduct always be formally reported before an employer can be held liable for failing to stop a supervisor's harassing conduct. As stated by the United States Supreme Court about potential vicarious liability of employers in sexual harassment cases, "absence of notice to an employer does not necessarily insulate that employer from liability." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S. Ct. 2399, 2408, 91 L. Ed. 2d 49 (1986). The high court specifically rejected an argument that "the mere existence of a grievance procedure and a policy against discrimination, coupled with [employee's] failure to invoke that procedure, must insulate [employer] from liability." *Id*.

For example, if harassing conduct is not formally reported, but is brought to the attention of supervisors who fail to take action, the employer may also be subject to vicarious liability for actions occurring before any formal report, despite the existence of a facially effective anti-harassment policy. *See Clark*, 400 F.3d at 350-51 (evidence of lower-level supervisors witnessing and failing to report incidents of higher-level supervisor engaging in questionable behavior – despite supervisors' duty to report any harassment under employer's policy – created issues of fact about whether employer exercised reasonable care to prevent and correct harassment). Therefore, we cannot agree with the trial court's finding

that LFUCG was shielded from any possibility of vicarious liability at the summary judgment stage.

## II. B. 2. Other Elements of Hostile Work Environment Based on Sex

We next address whether LFUCG was entitled to judgment as a matter of law on other grounds. In addition to some basis for holding the employer liable, a viable claim of hostile work environment based on sex requires proof of: 1) being a member of a protected class, 2) being subjected to "unwelcome sexual harassment," 3) the harassment being based on one's sex, and 4) the harassment creating a hostile work environment. *Gray*, 467 S.W.3d at 805 (citing *Clark*, 400 F.3d at 347).

Barrell and Stewart are members of a protected class. Males such as Barrell and Stewart are entitled to protection against a hostile work environment – including conduct amounting to same-sex harassment. *Brewer v. Hillard*, 15 S.W.3d 1, 11 (Ky. App. 1999) (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)). Nonetheless, "[a]lthough the Supreme Court ruled in *Oncale* that same-gender sexual harassment cases are cognizable, the Court made it very clear that the plaintiff must show that the conduct constituted discrimination because of sex," in other words that "members of one sex are exposed to disadvantageous terms or conditions of employment to

-42-

which members of the other sex are not exposed." *Brewer*, 15 S.W.3d at 11 (quoting *Oncale*, 523 U.S. at 80, 118 S. Ct. at 1002).

Viewing all evidence in the light most favorable to Barrell and Stewart, there is at least a genuine issue of material fact about whether both men were subjected to unwelcome conduct which subjectively and objectively created a hostile work environment. To the extent that the trial court's summary judgment suggests that Barrell could not show any unwelcome harassing conduct at all due to some conflicting evidence, this is inconsistent with viewing the entirety of the evidence in the light most favorable to the non-moving party.

The trial court did not explicitly state that Stewart could not show unwelcome harassment, though it noted that Bishop's alleged conduct was directed at Barrell rather than Stewart. But a supervisor's directing lewd comments and gestures toward another worker before a captive audience of other employee(s) can be understood as harassing behavior towards witnesses of the same protected class as well as the direct target of the offensive conduct. *See Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009) (describing harassment consisting of vulgar, sexist comments and conduct directed at plaintiff and to other women employees in her presence and noting: "The natural effect of exposure to such offensive conduct is embarrassment, humiliation and degradation

. . . ."). Thus, both Barrell and Stewart established at least triable issues of fact on the element of being subjected to unwelcome harassment.

Even assuming both had been subjected to unwelcome harassment, the trial court determined Barrell and Stewart failed to present evidence the harassment occurred because of their sex or of a discriminatory environment toward males. But despite any lack of direct evidence of discriminatory animus towards males in general, the alleged conduct itself – consisting of lewd comments and gestures and inappropriate touching directed to, and witnessed by, subordinate male employees – could support an inference of an attempt to humiliate subordinate males.

Although some evidence suggests that female employees may have also witnessed some inappropriate comments or conduct toward Barrell, no evidence shows the same conduct, including "humping" motions behind one's back, being directed at females. In *Brewer* (which involved similar allegations of lewd comments and gestures and inappropriate touching), 15 S.W.3d at 4, we concluded the evidence was sufficient to support the jury's finding of harassment based on sex and noted no evidence had been presented of the same conduct being directed towards females. *Id.* at 12. Although *Brewer* involved a trial rather than a summary judgment, and the opinion does not describe the evidence presented other than noting the lack of evidence of similar conduct directed at female employees,

-44-

perhaps an inference – rather than direct evidence – led to the jury's finding that the plaintiff was harassed due to sex. Of course, proving a hostile work environment requires proof of both subjectively perceiving such an environment and of circumstances supporting an objective finding of a hostile work environment. *Gray*, 467 S.W.3d at 805.

The trial court rejected any possibility that Barrell could prove subjective perception of an abusive environment, pointing to Barrell's deposition testimony that at one point he had not viewed the harassment as severe and did not perceive an instance of being patted on the posterior as anything worse than a coach-like gesture of approval. Obviously, this portion of Barrell's testimony might provide ample fodder for cross-examination at trial. But viewing the entirety of the evidence – including oral and written statements expressing how both Barrell and Stewart were offended and embarrassed by Bishop's conduct – in the light most favorable to the non-moving parties, there are at least genuine issues of fact for trial about their subjective perception of a hostile work environment.

As for determining whether an objectively hostile work environment has been shown, "common sense" and "an appropriate sensitivity to social context" are important. For example, a pat on the backside might be perceived differently on an athletic field versus an office. And there is a need to distinguish between innocuous teasing or rough-housing versus "severely hostile or abusive" conduct.

-45-

*Brewer*, 15 S.W.3d at 12 (quoting *Oncale*, 523 U.S. at 82, 118 S. Ct. at 1003).

Accepting the plaintiffs' allegations about Bishop's conduct to be true, the conduct is similar to that discussed in *Brewer*. At least some evidence indicates more than an isolated incident and, despite any lack of direct threats, evidence of lewd comments combined with humping motions and posterior-patting suggests humiliating conduct, especially when witnessed by other employees.

So, whether the conduct alleged here is sufficiently pervasive or severe as to create an objectively hostile work environment is, in our judgment, not appropriately resolved by summary judgment under Kentucky's standard. [20] This is especially true given questions of fact about when and how often the conduct occurred and in whose presence. This type of fact finding is left to a jury.

When properly viewing the evidence in the light most favorable to Barrell and Stewart for summary judgment purposes, general issues of material fact existed and LFUCG was not entitled to judgment as a matter of law on their sexual harassment claims. Therefore, we reverse the grant of summary judgment on Barrell's and Stewart's claims of hostile work environment based on sex.

---

[20] Though allegations of sexual harassment were resolved by trial rather than summary judgment in *Brewer*, we aptly noted in our discussion of other issues that summary judgment standards are different in Kentucky state courts versus federal courts. *Id.* at 10.

## II. C.  Gender-Based Discrimination – Failure to Promote

Having concluded the trial court erred in the grant of summary judgment on Stewart's and Barrell's claims of hostile work environment based on sex, we next address Ann Ratliff's gender-based discrimination claim. [21] Ann Ratliff, the only female Appellant, alleged that she received less favorable treatment in employment decisions based on her gender.  Specifically, Ratliff claimed gender-based discrimination in not being selected as an acting supervisor and not being promoted to either of two permanent supervisory positions which became open in 2009.

She also pointed to evidence that a male (Brian Butler) was treated differently than her since he was allowed to continue working on modified light duty in excess of LFUCG limits in 2010.  In contrast, she was not allowed to exceed modified light duty limits after a work injury left her unable to perform her original job duties, so she was forced to accept a demotion around 2002.

The trial court held any gender discrimination claim related to the modified light duty policy was time-barred under the five-year statute of limitations in KRS 413.120(2) since Ratliff was demoted about 2002 but the complaint was not filed until 2011.  Ratliff does not explicitly argue that the trial court erred in finding this particular claim time-barred in her briefs.

---

[21] Ratliff does not argue she was subjected to sexual harassment in her briefs.

She also does not argue that the trial court erred in concluding she could not prevail on allegations of harassment creating a sexually hostile work environment. Nor does she argue it erred in concluding she could not prove gender discrimination claims based on written reprimands she received.[22] So, we will only address whether the trial court erred in granting LFUCG summary judgment on her gender discrimination claims related to her not being assigned as an acting supervisor nor promoted to a permanent supervisor.

Ratliff does not explicitly challenge the trial court's determination that she did not come forward with direct evidence of discrimination. Therefore, we analyze her gender discrimination case under the burden-shifting framework in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[23] *Weickgenannt*, 485 S.W.3d at 306 n.8 (citing *Commonwealth v. Solly*, 253 S.W.3d 537, 541 (Ky. 2008)).

To make a *prima facie* showing of gender-based discriminatory action, a female plaintiff "must show that she is a member of the protected class, that she was subject to an adverse employment action, that she was qualified for

---

[22] Instead, Ratliff has argued retaliation claims relating to the reprimands she received.

[23] If there is direct evidence of discrimination, it is not necessary to apply the *McDonnell Douglas*-type framework. *See Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495-96 (Ky. 2005) (plaintiff must either provide direct evidence of "discriminatory animus" or satisfy the elements of the *McDonnell Douglas* burden-shifting test to prove discrimination).

the position, and that a similarly situated male was treated more favorably." *Solly*, 253 S.W.3d at 541. If a plaintiff makes a *prima facie* showing of discriminatory action, the burden then shifts to the employer to offer proof of a legitimate, non-discriminatory reason for the employment action. If the employer offers a non-discriminatory reason, the plaintiff must then be afforded a fair opportunity to show that the stated reason is pretext for discrimination. *Weickgenannt*, 485 S.W.3d at 306.

## II. C. 1. Qualifications for Promotion

Ratliff argues that she made a *prima facie* showing of gender discrimination in regard to both the acting supervisor assignments and permanent supervisor positions. The trial court, however, only explicitly found a failure to make a *prima facie* showing on the acting supervisor assignments.[24] The trial court explicitly stated Ratliff could not prove qualification to serve as an acting supervisor because "[she] did not have supervisory experience on the crews that needed a temporary supervisor." (Summary Judgment, p. 8.)

LFUCG argues the trial court correctly decided Ratliff was not qualified to serve as an acting supervisor because she was on a different crew and

---

[24] Ratliff points out in her brief that HR found her qualified for the permanent supervisor positions. And she argues that she was even more qualified for the permanent positions in some respects than the promoted males. Yet the trial court did not explicitly conclude she was not qualified for the permanent supervisor positions.

-49-

did not have supervisory experience on the crews with temporary supervisor needs. But LFUCG fails to point to any evidence about the required qualifications to serve as an acting supervisor or whether Ratliff met such qualifications in its brief.

Instead, LFUCG cites its Memorandum in Support of Summary Judgment to support this argument. But LFUCG cited no supporting evidence for this argument in this memorandum, either. And the memorandum itself is not evidence nor a pleading as defined in CR 7.01. *See* CR 56.03. Arguments made by counsel are not evidence. *See, e.g.*, *Dixon v. Commonwealth*, 263 S.W.3d 583, 593 (Ky. 2008). Therefore, arguments made by counsel in a motion, or memorandum in support of a motion, which do not cite to supporting evidence, do not provide a proper basis for granting summary judgment. On the other hand, Barnett (Ratliff's direct supervisor) opined on Ratliff's grievance filed with HR that she was qualified to serve as an acting supervisor. So, the trial court erred in concluding Barnett could not show she was qualified to be an acting supervisor; instead, there appear to be triable issues of fact on this matter.

## II. C. 2. Similarities with Comparators

In addition to concluding Ratliff could not show she was qualified to serve as an acting supervisor, the trial court held the males assigned to serve as acting supervisors were not sufficiently similar for Ratliff to establish a *prima facie* showing of discrimination. At first glance, this holding may seem consistent with

*Weickgenannt* – which indicates comparators must be "nearly identical" in all relevant aspects of their employment situations. 485 S.W.3d 308. However, *Weickgenannt* involved the unique context of university tenure decisions.

Further, shortly after *Weickgenannt*'s rendition, we held that a less onerous standard requiring only similar qualifications for discrimination claims applied to failure to promote cases. *See Walker v. Commonwealth*, 503 S.W.3d 165, 174-75 (Ky. App. 2016) (rejecting as inapplicable the nearly identical in all relevant aspects standard stated in a disparate treatment/wrongful discharge opinion stemming from a higher education setting – *McBrearty v. Kentucky Community and Technical College System*, 262 S.W.3d 205, 214 (Ky. App. 2008)). Our Supreme Court denied discretionary review of our opinion in *Walker*.

Applying the less onerous similar qualifications standard, Ratliff showed some genuine issues of material fact about whether she and the males assigned to serve as acting supervisors were similarly situated as she offered proof of her many years of experience in similar areas. The trial court erred in finding Ratliff failed to show similarity with the males appointed acting supervisors and concluding she failed to make a *prima facie* showing of gender discrimination.[25]

---

[25] LFUCG argued in its brief that Ratliff offered no evidence – besides her own testimony – of being better qualified to serve as an acting supervisor than a male selected to do so. But it was not necessary for her to offer proof of being better qualified to make a *prima facie* showing of gender discrimination – rather she simply had to, and did, offer proof that she was qualified and was similarly situated to those selected as acting supervisors.

As Ratliff did make a *prima facie* showing of gender discrimination regarding both acting and permanent supervisor positions, the burden then shifted to LFUCG to produce evidence of non-discriminatory reasons for her not being selected for these positions. As LFUCG offered facially non-discriminatory reasons for not promoting Ratliff, Ratliff would then have to show these reasons were pretext for discrimination to ultimately prevail on her discrimination claim.

## II. C. 3. Pretext

The trial court erred in concluding Ratliff could not prove that LFUCG's asserted, non-discriminatory reasons for not promoting her to a permanent supervisor position were pretextual. The reason offered by LFUCG for not promoting her to permanent supervisor was differences in interview scores. The trial court accepted LFUCG's assertion that Ratliff admitted interview scores could not have been discriminatory in her deposition. But Ratliff merely admitted that since the same questions were asked of each applicant, the **questions** were not discriminatory. Rating the impression a job candidate makes or how well the candidate answers interview questions is subjective. An interviewer could apply different standards to interviewees depending on their gender. Even though the same questions are asked, differences in interview scores could stem partly from discriminatory attitudes and not solely from actual differences in interview answers.

Despite noting Ratliff's "allegations of sexist conduct and comments by her superiors," (Summary Judgment, p. 7), the trial court still concluded Ratliff failed to present evidence of pretext. Mindful of the obligation to construe the evidence in the non-moving party's favor for summary judgment purposes, we disagree – Ratliff offered evidence which is sufficient to raise genuine issues of material fact on whether LFUCG's stated reasons were a pretext for discrimination.

Ratliff pointed to several items of evidence which a reasonable fact-finder could construe as indicating that LFUCG's reasons for its employment decisions were pretextual. She offered supportive testimony about her abilities and job performance from her supervisor and a co-worker, and she testified to observing several males, but no females, serving as acting supervisors over a several-year period. She also presented her own and others' testimony about her informally and successfully taking on supervisory duties as needed on a temporary basis when her boss was not present.

She also presented evidence of general statements from some supervisors/decision-makers that Ratliff would not be promoted. And she testified that she heard her supervisor, Jack Barnett, remark that he did not believe upper management would want a woman to be a supervisor. She also points to evidence that Director Williams refused to address issues in a grievance she filed and that

Williams told her that she could not even manage herself – which she construed as commentary on her appearance.[26]

Although Ratliff does not point to any evidence specifically relating decision-makers' estimation of her abilities to gender bias,[27] a reasonable fact-finder might infer gender bias from evidence of decision-makers stating she would not be promoted or expressing unfavorable opinions of her – especially in light of other evidence of women not being appointed acting supervisors and of Ratliff's requests to gain supervisory experience being repeatedly denied.

Effective evidence of pretext shows there is no basis in fact for the reason offered by the employer, or that the offered reason is not the actual reason, or that the reason does not sufficiently explain the employment decision. *Walker*, 503 S.W.3d at 176. The evidence presented by Ratliff could prompt a reasonable fact-finder to question whether wholly subjective interview scores alone sufficiently explain the employment decision.

---

[26] Williams's recollection of conversations with Ratliff may have differed from Ratliff's. Yet for purposes of summary judgment, the evidence must be viewed in the light most favorable to the party opposing summary judgment. *Weickgenannt*, 485 S.W.3d at 307.

[27] *Compare McClure v. Dollar General Stores Ltd.*, No. 2007-CA-001768-MR, 2008 WL 4092855, at *3 (Ky. App. Sep. 5, 2008) (concluding that age discrimination plaintiff showed there were triable issues about whether the employer's asserted legitimate and non-discriminatory reasons for termination were pretextual by offering evidence that a manager made statements to other employees that plaintiff needed to retire due to her age; thus reversing trial court's grant of summary judgment on age discrimination claim).

Construing the evidence in the light most favorable to Ratliff and resolving all ambiguities in her favor, Ratliff succeeded in demonstrating genuine issues of material fact about the reasons for her non-promotion. The trial court erred in deciding she could not prove pretext. *See Dollar General Partners v. Upchurch*, 214 S.W.3d 910, 916-17 (Ky. App. 2006) (though employer offered proof of non-retaliatory reasons for treatment of employee, jury verdict on retaliation was supported as conflicting evidence created issues of fact though it was not conclusive on pretext).

As Ratliff made a *prima facie* showing of gender discrimination and there were triable issues on pretext, the trial court erred in granting LFUCG summary judgment on Ratliff's gender discrimination claim.

## II. D.  Jack Barnett's Age Discrimination Claim

Next, we address the age discrimination claims of Jack Barnett. Barnett alleged the sole age discrimination claim in the complaint – asserting that he was unfairly passed over for promotion due to his age. Barnett was about 62 years old when the complaint was filed in 2011.

The KCRA prohibits discrimination on the basis of age over 40. KRS 344.040(1). Like other types of discrimination claims under the KCRA, an age discrimination claim requires that:  1) plaintiff is a member of a protected class, 2) plaintiff suffered adverse employment action such as being rejected for a position,

-55-

and 3) plaintiff was qualified for the position. Unlike other types of discrimination claims, an age discrimination claim does not require that the person hired for the position was NOT a member of the protected class – instead, the age discrimination plaintiff must show the person hired was significantly younger. *O'Connor v. Consol. Coin Caters Corp*., 517 U.S. 308, 313, 116 S. Ct. 1307, 1310, 134 L. Ed. 2d 433 (1996); *Williams*, 184 S.W.3d at 496.

Barnett, who was over 40 at all relevant times, was a member of a protected class. *See* KRS 344.040(1). Barnett applied for a promotion to serve as supervisor, senior over the equipment section in 2010, when he was about 61 or 62 years old. Instead of Barnett, Tony King, who was then about 50 years old, was selected for the position. The trial court granted LFUCG's motion for summary judgment, pointing out that King was also a member of a protected class since he was over 40 years old and concluding Barnett could not show age discrimination.

The trial court also accepted LFUCG's asserted reasons for selecting King for the position – based on "interviews, job qualifications and job performance" – as "legitimate, nondiscriminatory reasons for promotion." And despite Barnett's assertions of having more experience than King, the trial court stated: "King was a supervisor within the same area of responsibility that he was promoted for longer than Barnett had worked for LFUCG." The trial court also

concluded that Barnett failed to offer evidence of pretext except for "Barnett's own statements and allegations." (Summary Judgment, p. 12.)

Barnett argues the trial court erred in granting summary judgment since King was significantly younger than he, citing authority that an eight-year age difference is substantial. *See Williams*, 184 S.W.3d at 496. We agree with Barnett that the at least ten-year age difference between Barnett and King was a significant difference. So, the trial court was incorrect in rejecting any *prima facie* showing of age discrimination based solely on King's being over the age of 40 himself. *See id.*

Barnett asserts he had significant experience in the equipment section. He cites to evidence of his many years of experience as well as his recent service as an acting supervisor over the sweeper crew for which he received a good evaluation. Barnett offered sworn deposition testimony about events he had personal knowledge of, including his years of experience, his recent experience as an acting supervisor, and his observation of a significantly younger candidate being promoted instead of him. With this proof, he made a *prima facie* showing of age discrimination.

LFUCG offered facially non-discriminatory reasons for selecting the younger candidate for the promotion, including differences in job qualifications and differences in performance on the job and in interviews. But as we previously

discussed, grading interview performance is subjective and may be influenced by discriminatory attitudes, and the same is true about grading job performance.

Furthermore, Barnett offered proof from which a reasonable fact-finder might infer that LFUCG's stated reasons were pretextual. Namely, he testified to being told interviews were being conducted for the position of senior supervisor over the equipment section. He also testified to observing that King was promoted to this position before Director Williams switched the senior supervisors over the equipment and sweeper crews. Barnett argues that an inference can be made that Williams did this in order to discriminate against him. (Barnett had testified to mainly having experience in the equipment section, despite having recently served as acting supervisor over the sweeper section for 90 days and receiving a good evaluation for doing so.)

Though the trial court dismissed Barnett's testimony about age discrimination as uncorroborated or self-serving, it was sworn testimony. And though Barnett might lack personal knowledge of the actual motivation for Williams's actions, Barnett's testimony about his own recollection of statements or events which he witnessed should not be ignored for lack of corroboration.

Though this Court held that one's "self-serving testimony" could not defeat a properly supported summary judgment motion under different circumstances, that was in the context of a litigant's making statements about

matters of which he had no personal knowledge.  *See Smothers v. Baptist Hospital East*, 468 S.W.3d 878, 885 (Ky. App. 2015) (holding father's denial of the existence of proof that child received medical treatment "cannot overcome the substantial evidence of record" indicating child received treatment at hospital on two occasions, especially evidence of health insurance paying for treatment).  This holding followed earlier discussion noting that the child's mother had taken the child to the hospital on the two occasions and that the father (who provided health insurance) denied any knowledge of the hospital visits or any treatment provided. *See id*. at 880.  Despite the reference to the father's "testimony," the opinion also does not explicitly refer to any deposition or affidavit.  And it states the father failed to offer any affirmative proof to counter the well-supported summary judgment motion, making it unclear whether any testimony by deposition or affidavit was actually at issue.  *See id*. at 885.[28]

In contrast, here, Barnett offered sworn deposition testimony that Williams told him interviews were being conducted for the senior supervisor of the equipment section position.  He also testified to observing King being promoted to

---

[28] LFUCG also brings to our attention two unpublished cases to support the proposition that one's self-serving statements cannot defeat a properly supported summary judgment.  But neither case is binding authority. CR 76.28(4)(c).  And neither specifically discusses allegedly self-serving deposition testimony.  *See generally Childers v. Caniff Funeral Home, Inc*., No. 2010-CA-001944-MR, 2011 WL 4633890 (Ky. App. Oct. 7, 2011); *Whalen v. Mueller Roofing Distributors, Inc*., No. 2003-CA-000925-MR, 2004 WL 2566056 (Ky. App. Nov. 12, 2004).

senior supervisor over the equipment section before being switched to supervisor over sweeper crew. This could possibly support an inference of pretext.

Construing the evidence of record in Barnett's favor, proof exists which would allow a reasonable fact-finder to infer that the reasons offered by LFUCG for the decision were not the real reasons or did not sufficiently explain the decision. *See Walker*, 503 S.W.3d at 176.

In short, the trial court erred in concluding that Barnett did not make a *prima facie* case of age discrimination and could not prove pretext. Thus, the trial court erred in granting summary judgment in LFUCG's favor on his age discrimination claim.

## III. Retaliation

Having concluded that the trial court erred in granting LFUCG summary judgment on the discrimination claims discussed in Appellants' briefs, we next address Appellants' retaliation claims. Four elements are required to make a *prima facie* showing of retaliation under the KCRA: 1) plaintiff engaged in activity protected by civil rights law, 2) defendant knew of the protected activity, 3) afterwards, defendant took adverse employment action against the plaintiff, and 4) there exists a causal connection between the protected activity and the adverse employment action. *Brooks v. Lexington-Fayette Urban County Housing Authority*, 132 S.W.3d 790, 803 (Ky. 2004) (citing *Christopher v. Stouder*

*Memorial Hosp.*, 936 F.2d 870, 877 (6th Cir. 1991)). If the plaintiff makes a *prima facie* showing of retaliation but the defendant offers proof of non-retaliatory reasons for its actions, the plaintiff needs to show the offered reasons are mere pretext to meet the burden of persuading the fact-finder that unlawful retaliation occurred. *Kentucky Dep't of Corrections v. McCullough*, 123 S.W.3d 130, 134 (Ky. 2003).

When presented with LFUCG's motion for summary judgment on Appellants' retaliation claims, the trial court had to resolve not whether Appellants met their burden of persuasion, but whether there were triable issues, when viewing the evidence in the light most favorable to Appellants. *See Steelvest*, 807 S.W.2d at 480 (trial judge faced with summary judgment motions "must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists"). Summary judgment was only proper if it would be impossible for the non-moving parties (here Appellants) to present evidence warranting judgment against LFUCG and in Appellants' favor at trial. *Id*. at 483. We find the trial court erred in concluding none of the Appellants could prove all required elements of their retaliation claims and granting LFUCG summary judgment on these claims.

**III. A. Retaliation Claims of Barrell and Stewart**

First, we address the retaliation claims of the two Appellants who alleged claims for hostile work environment based on sex, Barrell and Stewart.

The trial court did not explicitly state they failed to come forward with evidence of the first two elements: protected activity[29] and the employer's knowledge of the protected activity. But it concluded they could not show the third and fourth elements, adverse employment action and causal connection.

The trial court interpreted the adverse employment action element as requiring evidence of loss of pay or other benefits or other tangible job detriment. It held that many actions alleged by Barrell did not qualify as adverse employment actions because of lack of tangible effect on pay or benefits or job duties. These allegations included verbal threats and increased scrutiny, false charges of sexual harassment by a co-worker, Barrell's harasser not being demoted, and lateral transfers or reassignments.[30] Similarly, the trial court viewed as not qualifying

---

[29] Stewart offered evidence of his signing the January 2009 memorandum about racial matters and participating in HR interviews, as well as his filing an EEOC charge of sexual harassment and orally telling an HR representative about alleged sexual harassment. Both Stewart and Barrell offered evidence of their telling or trying to tell SRF management about alleged sexual harassment. And Barrell also offered evidence of his cooperating with the investigation stemming from Stewart's EEOC charge of sexual harassment.

[30] The trial court seemingly accepted that other actions could qualify as tangible employment actions but viewed them as unsupported by the evidence. This included allegations of unsafe working conditions and being assigned undesirable job duties like weed-eating – which the trial court noted Barrell admitted was within his job duties. Notably, the trial court also viewed his allegations of further sexual harassment as unsubstantiated due to lack of formally reporting continuing harassment. But lack of formal written reports does not necessarily prove harassment did not occur or that the employer could not be held liable as we previously discussed.

The trial court also held that delays in processing Barrell's Family Medical Leave Act ("FMLA") requests could not qualify as adverse employment actions. And it noted indications that Barrell's eventual resignation was voluntary. As we conclude that evidence of other actions was sufficient to make a *prima facie* showing of adverse employment action, we decline to reach issues of FMLA preemption or other issues related to his FMLA leave requests.

tangible adverse employment actions Stewart's additional allegations of verbal

threats and increased scrutiny, his job evaluations suddenly getting worse, and his

receiving written reprimands, since these did not affect his pay or benefits.[31]

### III. A. 1.  Adverse Employment Action

Appellants argued, and we agree, that the trial court did not apply the

proper definition of adverse employment action for retaliation claims.  In the

context of civil rights retaliation actions, an adverse employment action does not

have to entail loss of pay or benefits.  Instead, it includes a variety of actions which

would deter a reasonable worker from filing a civil rights claim.  *Burlington*

*Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165

L. Ed. 2d 345 (2006).

For example, even a suspension which was later rescinded with back

pay could constitute adverse employment action – despite lack of permanent loss

of pay or benefits – because emotional distress and financial worries could

dissuade a reasonable worker from asserting a civil rights claim even if the

employee eventually received backpay.  *Id.* at 72-73, 126 S. Ct. at 2417.  The

---

[31] Though Stewart also offered evidence he was subjected to difficult or dangerous job assignments, the trial court pointed to evidence such assignments were among his job duties and its perception of lack of evidence of unsafe conditions.  And though Stewart also pointed to evidence of his termination being sought purportedly on grounds of violating the light duty policy, the trial court did not view this as a qualifying adverse action since Stewart ultimately prevailed on proceedings before the Commission and since the parties later dismissed by agreed order LFUCG's appeal to circuit court of the Commission's decision.

Supreme Court also recognized that seemingly minor events not affecting pay or benefits like schedule changes or not inviting an employee to lunch could, under some circumstances, cause real injury or harm; harm or injury such as difficulties in caring for children or effects on access to training. *Id*. at 69, 126 S. Ct. at 2415.

### III. A. 2.  Causal Connection

In addition to applying an overly narrow definition of adverse action, the trial court erred in concluding Barrell and Stewart could not prove causal connection since some evidence indicated retaliation was not the sole motive for adverse action.  For example, the trial court noted that Stewart and Barrell admitted to engaging in conduct for which they could be subject to discipline under LFUCG's policies.  But the trial court failed to acknowledge that, construing the evidence in the non-moving parties' favor, issues of fact existed about whether disciplinary policies were applied differently to employees who did not engage in protected activities.

The trial court erred in concluding Barrell and Stewart could not show the causal connection element.  A plaintiff does not have to show that retaliation was the sole motive for adverse actions to show a causal connection. Instead, he/she must show that "unlawful retaliatory motive was so integral to the adverse action that more likely than not the action would not have been taken had

the employee not engaged in protected activity." *Asbury University v. Powell*, 486 S.W.3d 246, 260 (Ky. 2016).

In gleaning which events were integral to leading to adverse actions, temporal proximity (events occurring close in time) can indicate a causal connection despite a lack of direct evidence. Generally, the shorter the time between a protected activity and an adverse action, the more likely there is a causal connection. This can be especially when other legitimate reasons for the action are not evident. So, in the absence of direct evidence of causation, precedent recites that for most cases, a "close temporal relationship" is required to infer causation. *See McCullough*, 123 S.W.3d at 135.

Whether the length of time between protected activity and adverse action is close enough to create an inference of causation depends on the circumstances. *Upchurch*, 214 S.W.3d at 916. Some decisions have interpreted time lapses of just a few months between events as not demonstrating a close temporal relationship which would, by itself, create an inference of causation. *See Brooks*, 132 S.W.3d at 804 (emphasis added) (four-month time lapse between events was "too long to create, **by itself**, an inference of causality"). *But see Upchurch*, 214 S.W.3d at 916 (sufficiently close temporal relationship to infer causation where adverse action occurred five months after employee filed workers' compensation claim and three months after he took medical leave).

Other cases recognize that time lapses of several months or more do not make a showing of causal connection between protected activity and retaliatory action impossible. For instance, the Sixth Circuit held an eleven-month delay between protected activity and adverse action did not make a showing of causal connection impossible, due to evidence of retaliatory statements and lack of prior opportunities for the employer to retaliate. *Kirilenko-Ison v. Board of Education of Danville Independent Schools*, 974 F.3d 652, 665-66 (6th Cir. 2020).[32]

The trial court did not specifically discuss the timing of protected activities and adverse actions in concluding Barrell and Stewart could not show a causal connection in its summary judgment orders. Nonetheless, Barrell and Stewart presented evidence of temporal proximity: adverse actions occurring within several months of protected activities such as reporting harassment to management, filing EEOC charges, and cooperating in investigations. And they also offered evidence that upon being informed of discrimination complaints or similar protected activities, Williams expressed frustration and displeasure – which a reasonable fact-finder might construe as making retaliatory statements.

In light of this evidence of relevant circumstances, including temporal proximity and retaliatory statements, at a minimum Barrell and Stewart

---

[32] Though *Kirilenko-Ison* was rendered after the trial court entered the summary judgments at issue, the principles it applied were established in precedent preceding the 2017-2018 summary judgment proceedings here.

demonstrated there were genuine issues of material fact about any causal connection between protected activities and adverse action.

In sum, as the trial court erred in concluding Barrell and Stewart failed to a make *prima facie* showing of all required elements of their KCRA retaliation claim,[33] its grant of summary judgment in LFUCG's favor on their retaliation claims must be reversed.

## III. B.  Retaliation Claims of Others Claiming Racial Harassment

Next, we address the retaliation claims of the other Appellants who, in addition to Stewart, also alleged racially hostile work environment claims. The trial court granted LFUCG summary judgment on retaliation mainly based on its determination that Appellants failed to offer evidence of a causal connection between protected activity and adverse action.  But for some Appellants, the trial

---

[33] The trial court concluded Barrell and Stewart could not make a *prima facie* case of retaliation, so it did not go on to address whether LFUCG offered legitimate, non-retaliatory reasons for actions or whether Barrell and Stewart offered evidence LFUCG's stated reasons were pretextual.  *See generally McCullough*, 123 S.W.3d at 134.  To the extent that LFUCG argues Barrell and Stewart could not show that its asserted reasons for actions were pretextual, there appear to be questions of fact concerning the real reasons for LFUCG actions, so, summary judgment in its favor was not merited although evidence of pretext is not conclusive.  *See Upchurch*, 214 S.W.3d at 917 ("[w]hile far from conclusive, there was sufficient evidence to support the jury's conclusion that Dollar General's reasons were a mere pretext" – including evidence of lack of prior complaints about employee, lack of documentation a zero-tolerance policy existed when alleged improper conduct occurred, and indications of effort to gather evidence against employee before employer became aware of allegations employee engaged in improper conduct).

court was not even satisfied that they offered proof of engaging in a protected activity.

### III. B. 1.  Protected Activity

The seven Appellants who asserted a racially hostile work environment also asserted retaliation claims.  They alleged engaging in protected activities, including their signing and/or circulating the January 2009 informal memorandum about racial problems in SRF.  The trial court generally accepted that signing and circulating the memorandum were protected activities[34] as they could be construed as reporting discrimination or opposing unlawful activities under the KCRA.[35]

The trial court determined, however, that for some Appellants, signing the memorandum did not qualify as a protected activity because they admitted to

---

[34] LFUCG argues on appeal that the memorandum was vague and that vague charges of discrimination do not constitute protected activity.  However, construing the evidence in the light most favorable to the non-moving party, we believe that there was proof of protected activity sufficient to survive summary judgment.  In addition to the memorandum itself, these Appellants testified to participating in HR interviews in which they fleshed out why they perceived racial discrimination and other civil rights violations.  Though HR representatives' testimony and written notes may conflict with some Appellants' testimony about what was discussed, this presents genuine issues of material fact rather than an impossibility of Appellants' being able to prove protected activity.

[35] The trial court also noted that filing of the lawsuit at issue here was a protected activity.  However, it concluded there was lack of evidence of adverse actions occurring after the filing of the lawsuit for many Appellants.  In any event, we agree with Appellants that evidence of the signing and circulation of the memorandum was sufficient to get past summary judgment on the element of protected activity.

not having personal knowledge of every item listed in the memorandum. For example, the trial court noted Ross's admission in deposition testimony to not having personal knowledge about specific instances of failure to promote African-Americans noted in the memorandum. And the trial court viewed "Bledsoe's HR interview" as indicating he had "very little knowledge" of the allegations in the memorandum.[36] (Bledsoe/Price Summary Judgment, p. 14.) (Though the basis for its conclusion that Cowherd did not act in good faith is not discussed in its analysis on retaliation, other parts of its summary judgment order suggest the trial court viewed the evidence as showing Cowherd had personal knowledge of only a few items on the memorandum.) Based on its perception that these Appellants lacked personal knowledge of the full spectrum of allegations in the memorandum, the trial court concluded that Ross, Cowherd, and Bledsoe did not act in good faith in signing the memorandum and that their signing the memorandum was not a protected activity.

Despite the trial court's doubts about some Appellants' having acted in good faith in signing the memorandum, KRS 344.280 does not contain an explicit good faith requirement. And precedent clearly states that plaintiffs do not have to offer affirmative evidence of good faith for retaliation claims to survive a

---

[36] It is unclear whether the trial court is referring to HR's written notes about Bledsoe's interview or deposition testimony about his interview.

summary judgment motion.  Plaintiffs do not even bear the burden of persuading the fact-finder that they acted in good faith.  However, if a defendant raises allegations of lack of good faith as an issue at trial, "[e]vidence negating good faith would be relevant to refute the plaintiff's claim that [he] had actually engaged in the protected conduct underlying his retaliation claim."  *Charalambakis v. Asbury University*, 488 S.W.3d 568, 581 (Ky. 2016).  Generally, a plaintiff is only required to have a reasonable, good faith belief that the employer's action violated the KCRA.  *Id.* at 580.  If the employer offers sufficient evidence at trial to cast doubt on the employee's reasonableness and good faith, a jury question is presented.  *Id.* at 580-81 (citing *e.g.*, *Powell*, 486 S.W.3d at 253).

Given that plaintiffs do not have to affirmatively show good faith, and given the obligation to construe the evidence in the light most favorable to those opposing summary judgment, the trial court erred in concluding that these Appellants could not show protected activity.  Despite some indications of lacking personal knowledge of certain specific matters in the memorandum, these Appellants did not admit to a lack of personal knowledge about every item in the memorandum – particularly general allegations of racism and verbal abuse.  Instead, each testified to observing or perceiving racism and verbal abuse in certain contexts, including desirable overtime assignments not being offered to African-Americans and the use of cursing and racial slurs.  At the very least, despite any

contrary evidence of lack of personal knowledge or good faith which LFUCG may present at trial, the evidence when construed in Appellants' favor reveals at least triable issues about whether they engaged in protected activities.

And despite any issues about their signing the memorandum being protected activity, these Appellants also offered evidence of participating in the resulting investigation including being personally interviewed by HR. Thus, they presented evidence of another protected activity. *See* KRS 344.280(1) (prohibiting retaliation for participation in an investigation under the KCRA). So, LFUCG was not entitled to summary judgment on the basis of lack of protected activity.

Despite its reservations about signing the memorandum being a protected activity for some Appellants, the trial court seemingly accepted that LFUCG had knowledge of protected activities, including the signing and circulation of the memorandum and participation in the resulting investigation. In short, the element of the defendant having knowledge of protected activity is not at issue here. However, the trial court perceived that some Appellants could not prove the next element of adverse employment action.

### III. B. 2. Adverse Employment Action

The trial court regarded some allegations of adverse action, such as being subjected to unsafe working conditions, as unsubstantiated where Appellants' testimony was not backed up by others' testimony. But despite any

conflicts with others' testimony or lack of supporting testimony by others, Appellants' deposition testimony was under oath and must be considered under CR 56.03. Construing the evidence in the light most favorable to Appellants, they at least showed genuine issues of material fact on whether such events occurred.

Furthermore, the trial court concluded that some alleged actions did not qualify as adverse actions due to lack of tangible effect on pay, benefits, and the like. For example, it concluded that actions, including written reprimands, increased drug testing, ordering an employee to leave a special event called the Roadeo, denial of lateral transfer requests, and unrequested lateral transfers, could not qualify as adverse actions.

We find the trial court erred in applying an overly narrow definition of adverse action requiring tangible economic effects on pay or benefits, rather than recognizing that a broader scope of actions might reasonably dissuade reasonable workers from reporting discrimination. *See White*, 548 U.S. at 68, 126 S. Ct. at 2415. This is especially true since Appellants articulated in their deposition testimony how such matters as lateral transfers (requested or not) following protected activity affected their work experience and ability to perform their jobs despite lack of direct effect on pay or benefits.

For example, Hicks and others testified to their dismay about having to continue to work for a supervisor who engaged in discriminatory conduct, or

-72-

their being involuntarily transferred to crews who performed other tasks outside their areas of expertise. Similarly, Bledsoe testified to emotional distress and interference with work duties caused by being subjected to increased drug testing. And Carter testified to the discouraging effect of being sent home early from the Roadeo special event. Again, even seemingly trivial matters can have an impact which could dissuade reasonable employees from reporting discrimination depending on the circumstances. *White*, 548 U.S. at 69-70, 126 S. Ct. at 2416.

The trial court also rejected allegations of unsafe working conditions and of difficult or undesirable work assignments as either not qualifying as adverse actions or as not causally related to protected activity. The trial court noted evidence of assignments being within one's general work duties or all employees within the department being subjected to certain unsafe work conditions such as having to work in a thunderstorm. Yet, more frequently assigning dangerous, difficult, or undesirable tasks to employees who have engaged in protected activity, rather than others who had not so engaged, could dissuade reasonable workers from reporting KCRA violations. This could be true even if such tasks were within the employee's stated work duties.

Under the broader definition of adverse actions applicable to retaliation claims, each of these Appellants offered evidence of at least one adverse action. (These adverse actions include suspensions for Carter and Price, increased

drug testing for Bledsoe, non-promotion and unsafe working conditions for Hicks, terminations for Bledsoe and Price, and later rescinded terminations/proceedings for Ross and Cowherd.)

### III. B. 3.  Causal Connection

Even assuming that each Appellant offered proof of an adverse employment action, the trial court concluded that each Appellant failed to offer proof of a causal connection between protected activity and adverse action.  The trial court noted lack of direct admissions from decision-makers that Appellants were qualified for promotions they sought or that discipline was imposed for reasons other than those allowed under LFUCG policies.

"Because there is often a lack of direct evidence, proof of a causal connection can be difficult and requires reliance on inference."  *Upchurch*, 214 S.W.3d at 915.  In this context, temporal proximity – which does not necessarily mean that adverse action has to occur within days or weeks of the protected activity – can be used as a factor for inferring causation.  *See id*. at 915-16 (concerning claims of retaliation for filing workers' compensation claims).

Based on several months elapsing between the January 2009 memorandum and adverse actions, the trial court determined there was no temporal proximity sufficient for inferring causation of adverse actions – actions such as discipline imposed on Ross, Cowherd, and Carter in July and August 2009.  But

the trial court failed to recognize that these disciplinary actions occurred within three months of HR's issuing its May 2009 report stemming from the investigation.

Furthermore, the trial court failed to recognize that time lapse, standing alone, is not necessarily determinative of causation. Instead, even a time lapse of several months can convey temporal proximity sufficient to infer causation – especially with evidence of retaliatory comments. *See generally Upchurch*, 214 S.W.3d at 916; *Kirilenko-Ison*, 974 F.3d at 665. And despite erroneously concluding that Hicks offered no proof of a causal link between protected activity and adverse action, the trial court noted that Hicks testified to Williams expressing displeasure about Hicks's submitting a grievance which could easily be construed as a retaliatory statement.

In addition to its misperception of temporal proximity concerns, the trial court also erred in concluding Appellants could not show causal connection due to lack of direct evidence countering LFUCG's assertions that disciplinary actions were in accordance with its policies. For example, the trial court held that Carter could not show that retaliation for protected activity was "the motivating factor" for his suspension since "he admitted to all the facts warranting the suspension." (Carter Summary Judgment, p. 20.)

Again, Appellants were not required to prove that retaliatory motive was the only reason for discipline or other adverse action. *Powell*, 486 S.W.3d at

260. Construing the evidence in the non-moving parties' favor, a reasonable fact-finder could infer retaliatory motives played a part in disciplinary decisions. *Upchurch*, 214 S.W.3d at 917 (although evidence was not conclusive, it was sufficient to allow jury to infer pretext – which essentially means that despite legitimate reasons asserted by the employer, the plaintiff proved that the action was at least partially caused by retaliatory motives).

Given that Appellants presented testimony about observing differences in how LFUCG policies were applied to those who did not sign the memorandum, there were at least genuine issues of material fact about whether retaliation was among the causes of discipline and LFUCG was not entitled to judgment as a matter of law on their retaliation claims. CR 56.03.

### III. C.  Ratliff's Retaliation Claims

Next, we address Ratliff's retaliation claims. Ratliff points out that over the 2009-2010 time period she submitted both a charge of gender discrimination and several internal written grievances "complaining of less favorable treatment than male employees and violations of LFUCG policies." Afterwards, she claims she was subjected to retaliatory action including a "barrage of unwarranted written reprimands and excessive scrutiny by Sam Williams" from 2009 through early 2011 resulting in an intensely "hostile work environment."

Ultimately, the trial court granted summary judgment because it determined, based on the evidence before it, Ratliff could not show adverse employment action. As an alternate basis for granting summary judgment, it also determined that Ratliff could not prove a causal connection between protected activities and an adverse action.

The trial court accepted that Ratliff had engaged in protected activities. It viewed as a protected activity Ratliff's 2010 grievance about Brian Butler's modified duty assignment "because it was asserted as evidence of gender discrimination . . . ." (Summary Judgment, p. 13.) The trial court also viewed as protected activities Ratliff's October 2009 written grievance about being denied opportunities to serve as acting supervisor and Ratliff's December 2009 gender discrimination charge filed with the EEOC.

Accepting that Ratliff showed protected activities, the trial court did not expressly discuss whether the employer was aware of these protected activities – but presumably it was satisfied that there was evidence of employer awareness of the protected activities.[37] Next, the trial court next addressed whether Ratliff could show adverse employment action based on the evidence and concluded she could

[37] Then-SRF Director Sam Williams admitted to at least some awareness of Ratliff's having filed internal grievances and an EEOC charge in his deposition. And for purposes of summary judgment review, the evidence must be viewed in the light most favorable to the non-moving party. *Weickgenannt*, 485 S.W.3d at 307.

not. The trial court recognized that a demotion could constitute an adverse action, but it concluded any retaliation claim related to Ratliff's circa-2002 demotion was now time-barred. Ratliff does not explicitly argue that this particular conclusion is incorrect in her briefs.

The trial court also rejected Ratliff's argument that she suffered adverse action based on her receiving reprimands. It cited Sixth Circuit precedent which it construed as holding that written reprimands which did not result in "material adverse consequences" such as lower pay or demotion or suspension were not considered adverse action in the retaliation context. *See Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir. 2013); *Creggett v. Jefferson County Board of Education,* 491 F. App'x 561, 566 (6th Cir. 2012).[38]

The trial court also concluded that even if reprimands were considered adverse actions, Ratliff could not show a causal connection between protected activities and the adverse actions because Ratliff admitted to the conduct underlying the reprimands and the conduct violated LFUCG policies. And in the

---

[38] The trial court also cited Sixth Circuit precedent indicating that being placed on a performance improvement plan was not considered adverse action. *See Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002); *Miceli v. United States Dep't of Transportation*, 83 F. Appx. 697, 700 (6th Cir. 2003). Ratliff does not specifically discuss authority about whether performance improvement plans are adverse actions for purposes of KCRA retaliation nor does she point to evidence of actually being put on a performance plan in her brief – although she cites supervisor Jack Barnett's testimony that Sam Williams wanted to put Ratliff on a performance improvement plan which could result in her termination.

trial court's view, Ratliff provided no evidence to support retaliatory intent as being among the reasons for the reprimands or that "but for the protected activities, she would not have received written reprimands." (Summary Judgment, p. 14.)

Ratliff does not directly challenge the trial court's statements that she admitted to the conduct at issue or that the conduct violated LFUCG policy. Instead, she argues the trial court's definition of adverse action was too narrow and the trial court erred in requiring her to show retaliation was the sole reason for adverse actions.

## III. C. 1.  Adverse Employment Action

Ratliff contends that the trial court failed to consider recent authority with a more flexible definition of adverse action not requiring actual cuts in pay or demotions or suspension.  For instance, she cites *White*, 548 U.S. 53, 126 S. Ct. 2405.  As we previously discussed, the United States Supreme Court rejected arguments that adverse action in the Title VII retaliation context required "a link between the challenged retaliatory action and the terms, conditions, or status of employment." *Id*. at 61, 126 S. Ct. at 2411.  But it still concluded that:  "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id*. at 67, 126 S. Ct. at 2414.  And it held:  "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might

have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68, 126 S. Ct. at 2415 (internal quotation marks and citations omitted). Recognizing the importance of individual circumstances, the Court discussed how even without direct economic consequences such as lower pay or benefits, other effects such as the emotional distress caused by certain employer actions could dissuade a reasonable worker from pursuing discrimination charges. *See id.* at 72-73, 126 S. Ct. at 2417.

Ratliff argues that the reprimands issued were adverse actions even if they did not directly affect her title or pay because they were placed in her employment file and could prevent her from receiving promotions. And she submits that even though two of these reprimands were later rescinded, they caused her emotional distress and should be considered adverse action since they could dissuade a reasonable worker from filing discrimination charges.

Construing the evidence of record in Ratliff's favor, she established at least genuine issues of material fact on whether adverse employment action occurred, pursuant to recent precedent such as *White*.

## III. C. 2. Causal Connection

Ratliff further argues she was not required to show that retaliatory intent was the only reason for the adverse action, citing *Powell*, 486 S.W.3d at 260.

She also argues the trial court must consider all relevant circumstances, including closeness in time, in assessing whether evidence might show a causal connection between protected activity and the adverse action, citing *Upchurch*, 214 S.W.3d at 916-17 (which also recognizes jury might make inferences in concluding reasons were pretextual). She cites recent Sixth Circuit precedent recognizing that a *prima facie* showing of retaliation should not be difficult to establish, as requirements are "easily met." *See Kirilenko-Ison*, 974 F.3d at 661. We agree; she established at least genuine issues of material fact on whether there was a causal connection between her protected activity and adverse action.

Based on our review of this authority and the evidence of record, we conclude the trial court erred in granting LFUCG summary judgment on Ratliff's retaliation claim. Construing the evidence and any ambiguities in Ratliff's favor, there were genuine issues of material fact on her retaliation claim and LFUCG was not entitled to judgment as a matter of law.

## III. D.  Barnett's Retaliation Claim

## III. D. 1.  Protected Activity

Next, we address Barnett's retaliation claim. The first required element of a retaliation claim is that a plaintiff engaged in a protected activity. *See Brooks*, 132 S.W.3d at 803. Unfortunately for Barnett, the trial court did not believe he even offered proof of protected activities. Specifically, the trial court

rejected his argument that three activities were protected activities: 1) his refusal to issue a performance improvement plan to Ratliff, 2) his filing an age discrimination charge with the EEOC in November 2010, and 3) his filing a grievance about Director Williams's intent to promote another employee. The trial court perceived the EEOC charge as lacking in specific factual allegations or anything to corroborate Barnett's belief he was discriminated against. So, it concluded the charge was "vague" and "unsupported" and thus not protected activity. (Summary Judgment, p. 16.)

We agree with Barnett that the trial court erred in determining that the filing of the EEOC charge could not be considered a protected activity. This is clearly contrary to the explicit statutory language of KRS 344.280(1) which prohibits retaliation for making a charge or filing a complaint. Also, case law cited by the trial court about vague charges of discrimination being unprotected pertains to vague statements in **internal communications** with an employer which fail to clearly oppose unlawful practices and does not suggest that filing an EEOC discrimination charge is not a protected activity.[39] *See Booker v. Brown &*

---

[39] We further reject any argument that the filed EEOC charge was not protected due to failure to show good faith. Again, our Supreme Court has held that a plaintiff is not required to plead or affirmatively prove good faith on a KCRA retaliation claim. *Charalambakis*, 488 S.W.3d at 580. Furthermore, "all that is required to obtain retaliation protection under KRS 344.280(1) is that the employee have a reasonable and good faith belief that the adverse employment practices she opposed were KCRA violations." *Id*. (internal quotation marks and citations omitted). As Barnett testified to his honest belief that age discrimination had occurred, the filing of the EEOC charge must be viewed as protected activity at this juncture. Further, case law discussing the

-82-

*Williamson Tobacco Co*., 879 F.2d 1304, 1313 (6th Cir. 1989) (holding "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice" after noting that sending a letter to one's employer was not filing a formal complaint of discrimination pursuant to statutory procedures); *see also Yazdian ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 645-46 (6th Cir. 2015) (allegations of "hostile work environment" in internal correspondence amounted to protected activity, *i.e.*, opposition to unlawful employment practice).

These cases did not establish a specificity requirement for filed EEOC charges to qualify as protected activity. Rather, they recognized that vague statements in internal correspondence which did not clearly allege discrimination might not qualify as a separate protected activity – opposing unlawful practices under civil rights laws. *See* KRS 344.280(1) (prohibiting retaliation for filing a formal complaint or charge of discrimination or for opposing unlawful practices). Though the trial court subjectively viewed Barnett's EEOC complaint as vague, we disagree that the filing of that complaint was not a protected activity.

---

necessity of showing good faith in KWA cases is not applicable to KCRA retaliation claims due to different statutory requirement. *See, e.g.*, *Thornton v. Office of Fayette County Attorney*, 292 S.W.3d 324, 329-30 (Ky. App. 2009).

Furthermore, Barnett's refusal to issue a performance improvement plan for Ratliff must also be regarded as protected activity under KRS 344.280. In light of his testimony that he perceived a "witch hunt" against Ratliff, his refusal to issue the performance improvement plan can be construed as opposing an unlawful practice – retaliation for Ratliff's own assertions of discrimination. *See* KRS 344.280(1). Similarly, to the extent that his filing a grievance about the proposed promotion of another employee could be construed as an allegation of age discrimination, that would also be a protected activity under the KCRA.

Next, we address Barnett's argument that he offered evidence of a causal nexus between his complaint of age discrimination and a series of retaliatory behaviors over several months beginning shortly after he filed his complaint. Barnett testified by deposition that after he filed his EEOC age discrimination charge in November 2010, Williams told Barnett to leave an engineers' meeting which he had previously been encouraged to attend and forbade Barnett from communicating with engineers in December 2010. He also testified about being reprimanded for clocking out a few minutes early despite having worked a long shift and receiving approval from his supervisor to clock out early in January 2011. He further testified to several other actions occurring over the next few months including: receiving unfair criticism, having supervisory duties removed, and being placed on a performance improvement plan in March and

April of 2011.  He testified to HR and LFUCG officials ignoring his reports of these allegedly retaliatory actions as well.

Barnett also testified to receiving an unexplained suspension without pay in late May 2011 and to receiving the worst annual evaluation of his career at LFUCG in June 2011.  He testified to being told his supervisor was pressured to sign off on this evaluation but refused to do so.  He also testified to being transferred to the Division of Water Quality in July 2011 and to being told that Williams had made negative statements about Barnett to Water Quality managers.  He also testified to only learning of secret grievances placed in his personnel file when deposed in 2013.

He also presented supportive deposition testimony from his supervisor in 2011 (Tony King) about perceived problems with the discipline imposed on Barnett.  And he presented testimony from King and another employee (Brian Butler) about Williams saying "I am HR" and making statements about the "Wrath of Sam" when hearing about Barnett and others alleging discrimination.

Applying more flexible precedent about defining adverse employment action and construing evidence about temporal proximity and retaliatory statements, Barnett at least presented genuine issues of material fact on adverse action and causal connection.  Thus, LFUCG was not entitled to judgment as a

matter of law on his retaliation claim and the trial court erred in granting it summary judgment.

## IV. KWA Claims

Next, we address the KWA claims filed by Appellants. KRS 61.102(1) prohibits an employer's reprisal against an employee who in good faith reports to an appropriate authority any facts or information about actual or suspected waste, fraud, mismanagement, abuse of authority or violation of the law.

The trial court viewed Appellants as trying to re-litigate the same factual allegations for both KWA and KCRA claims. It opined that when the same alleged conduct would violate both the KWA and the KCRA, the KWA claims would be preempted, citing *Gryzb v. Evans*, 700 S.W.2d 399 (Ky. 1985), and *Hill v. Kentucky Lottery Corporation*, 327 S.W.3d 412 (Ky. 2010).

Despite the trial court's contrary suggestions, a KWA claim would not necessarily be preempted because it was based on the same facts as a KCRA claim. Instead, a KWA claim would only be preempted if based on the same law as a KCRA claim.

Preemption occurs not solely because two claims are based on the same conduct but because claims are based on the same law. *Hill*, 327 S.W.3d at 421 (explaining common law wrongful discharge claim in *Gryzb* was preempted not because it was based on the same conduct as KCRA sex discrimination claim

but because both claims were based on the same law and public policy prohibiting sex discrimination).

Unlike the preempted wrongful discharge claim in *Gryzb*, the wrongful discharge claim in *Hill* was not preempted since plaintiffs did not allege that their discharge was based on discrimination prohibited by KRS Chapter 344. Instead, they were discharged for refusing to give false testimony – which would violate laws and public policy against perjury rather than against discrimination. *Hill*, 327 S.W.3d at 422. Because "the statutes that declare the unlawful act of perjury are not the same statutes that declare and remedy civil rights violations," our Supreme Court held that the plaintiffs' KRS Chapter 344 claims for opposing discrimination against a disabled employee did not "preempt the Hills' common law claims for wrongful discharge based on the public policy against perjured testimony." *Id.* at 423.

Following *Gryzb* and *Hill*, it is not whether the claims are based on the same conduct which determines preemption. Instead, it is whether the same unlawful acts defined by statutes are at issue. "Where the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute." *Gryzb*, 700 S.W.2d at 401.

Here, two statutes (KRS 344.280 and KRS 61.102) identify different unlawful acts. KRS 344.280 declares it illegal to retaliate against someone for filing complaints or charges of discrimination, opposing unlawful practices under the KCRA, or cooperating in investigations or hearings about KCRA claims. KRS 61.102 declares it unlawful to subject an employee to reprisal for reporting in good faith actual or suspected waste, fraud, mismanagement, abuse of authority, or violation of the law.

No Appellant argues in their brief that KWA claims of retaliation for filing EEOC discrimination charges would not be preempted by the KCRA. But all argue that they presented evidence of reprisal for otherwise reporting other violations of the law, not relating to discrimination or other violations of KCRA, or for reporting mismanagement, waste, or abuse of authority. For instance, the January 2009 memorandum alleging favoritism and verbal abuse, in addition to racism, could be construed as reporting not just discrimination or civil rights violations, but also general abuse of authority or mismanagement. Similarly, evidence of various Appellants' informally reporting how certain crews always received the most desirable overtime opportunities in verbal communications with HR can be construed as reporting abuse of authority or mismanagement. Additionally, Barrell's and Stewart's notifying HR and management of Bishop's actions could be construed as reporting not just possible sexual harassment, but

also horseplay and inappropriate verbal comments which not only violated LFUCG policies but could support findings of abuse of authority or mismanagement. And both Ratliff and Barnett offered evidence of reporting/disclosing to appropriate authorities (through HR grievances or otherwise) violations of LFUCG policies not specifically aimed at combatting discrimination – including alleged violations of LFUCG's modified light duty policy and alleged failure to comply with requirements for HR prequalification of acting supervisors.

The trial court erred in granting LFUCG summary judgment based on general conclusions that KWA claims were preempted due to being based on some common factual allegations with KCRA claims. There is, in fact, some evidence of reports of alleged mismanagement or abuse of authority not based on discrimination or other KCRA violations.

The trial court generally found KWA claims preempted in some Appellants' cases and did not address whether there was evidence of all required elements of a KWA claim – *i.e.*, in its orders granting summary judgment on the claims of Hicks, Barrell, Carter, and Stewart. But for some Appellants, the trial court also concluded they could not prove specific elements of KWA claims.

According to our precedent, showing a violation of KRS 61.102 requires elements including: "the employee made or attempted to make a good faith report or disclosure of a suspected violation of state or local law to an

appropriate body or authority" and "the employer took action or threatened to take action to discourage the employee from making such a disclosure or to punish the employee for making such a disclosure." *Davidson*, 152 S.W.3d at 251. And though not explicitly recognized in *Davidson*, a qualifying disclosure could also be of waste, fraud, mismanagement, or abuse of authority – as plainly provided in the language of KRS 61.102(1) and as noted in later precedent. *See Harper v. University of Louisville*, 559 S.W.3d 796, 803 (Ky. 2018).

Regarding Bledsoe and Price, the trial court acknowledged that their signing the January 2009 informal memorandum could be construed as a protected communication. But then it further said that Bledsoe and Price failed to come forward with evidence that their signing this memorandum was a contributing factor to the decision to terminate them. However, Bledsoe and Price also presented evidence of other possible acts of reprisal such as being subjected to excessive drug testing and being assigned dangerous duties. Furthermore, though the trial court accepted LFUCG's explanation that their termination was based solely on their failure to exercise their options after exhausting light duty limits, a reasonable fact-finder might not in any way share this view. Again, the trial court may not decide issues of fact at the summary judgment stage. Instead, it must determine if there are genuine issues of material fact while viewing the evidence in

the light most favorable to Bledsoe and Price and resolving any doubts in their

favor. *Steelvest*, 807 S.W.2d at 480.

Similar to its discussion of Bledsoe's and Price's retaliation claims,

the trial court also concluded there was no evidence the protected activity (signing

the memorandum) prompted Williams's decisions to discipline Ross and Cowherd.

The trial court further stated:

> Sam Williams had a legitimate explanation for his
> decision to discipline Ross and Cowherd for their actions
> in July and August 2009 and the evidence in the record
> that his explanation was pretext for retaliation in
> violation of KRS 61.102 does not rise to a preponderance
> of the evidence standard . . . .

(Ross/Cowherd Summary Judgment, p. 15.)  But the trial court should not have

resolved whether parties had fully proved their cases when ruling on summary

judgment motions by weighing the evidence and making credibility

determinations. *Steelvest*, 807 S.W.2d at 480.  Instead, it should have construed

the evidence in the non-moving parties' favor and it should have determined

whether genuine issues of material fact remained for trial. *Id*. at 482-83.

As for Barnett, the trial court did recognize that at least some facts

alleged by Barnett would relate to a KWA claim rather than a KCRA claim.  In

particular, the trial court noted Barnett's deposition testimony about expressing his

disagreement with Williams's intent to promote Brian Butler and his asking the

mayor's office if public employees were permitted to loan equipment to and to

otherwise assist private contractors. Acknowledging that this conduct could be construed as whistle-blowing, the trial court determined his KWA claim still could not survive summary judgment for failure to prove other requirements of KWA claims. It characterized what he reported as not a violation of the law and it perceived a lack of evidence that those involved in suspending him or otherwise retaliating against him knew of his reports. *See Davidson,* 152 S.W.3d at 251 (listing required elements of KWA claims as including employee's good-faith reporting or disclosure of "actual or suspected violation of the law" and employer's threatening to or actually taking actions to discourage the disclosure or punish the employee for the disclosure).

Though what Barnett allegedly reported may not have technically been a violation of any particular law, as he cites no ordinance or regulation establishing LFUCG's policies, the alleged communications might still be reasonably construed as reporting actual or suspected waste, fraud, abuse of authority or mismanagement. *See* KRS 61.102(1). And this is especially so when properly construing the evidence in his favor for summary judgment purposes.

Furthermore, though Barnett may not have presented direct evidence of Williams or other decision-makers being aware of his reports, a fact-finder could reasonably infer awareness based on temporal proximity and other factors. Construing the evidence and all ambiguities in Barnett's favor, he at least showed

genuine issues of material fact on his KWA claim and LFUCG was not entitled to judgment as a matter of law.

Properly construing the evidence in the non-moving parties' favor, genuine issues of material fact existed and LFUCG was not entitled to summary judgment on Appellants' KWA claims. Thus, the trial court erred in granting LFUCG summary judgment on KWA claims.

## V. Count XI of Complaint

Lastly, having determined that the trial court erred in granting LFUCG summary judgment on other claims, we review its grant of summary judgment in LFUCG's favor on Count XI in Appellants' complaint. In Count XI of the Complaint, the plaintiffs "individually, severally and jointly" alleged a "common pattern and practice" of both discrimination and retaliation violating the KCRA and of reprisal violating the KWA. (R., pp. 42-43.) Appellants declared: "Plaintiffs do hereby adopt and incorporate, individually and collectively, the averments contained in this Complaint in their entirety, the same as set forth at length in each count hereinabove." (R., p. 43.) (Each of the preceding ten counts of the complaint set forth allegations specific to one plaintiff.)

LFUCG filed a separate motion for summary judgment on Count XI as to all Appellants, in addition to filing separate summary judgment motions concerning all claims filed by each individual Appellant. The trial court did not

separately issue an order on the motion for summary judgment on Count XI, but instead granted LFUCG summary judgment on Count XI within its order granting LFUCG summary judgment on Ross's and Cowherd's claims.

LFUCG argued Appellants could not prevail on claims of systemic disparate treatment, sometimes called pattern or practice claims, because Appellants did not present statistical evidence. Appellants denied asserting "disparate impact" although they acknowledged presenting "examples" of "disparate treatment."[40] They stated these examples of disparate treatment were only "part of the much broader claims of hostile work environment" asserted by each Appellant based on race, gender, or age and based on improper retaliation for reporting discrimination and actual or suspected violation of the law. (R., pp. 604-05.) They argued Count XI must be "analyzed pursuant to applicable law for hostile work environment." (R., p. 605.)

Plaintiffs cited authority which suggested it would be appropriate to allow aggregated review of multiple plaintiffs' hostile work environment claims for summary judgment purposes under certain circumstances, even if some

---

[40] "Title VII prohibits both intentional discrimination, known as 'disparate treatment,' as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities, known as 'disparate impact.'" 45C AM. JUR. 2d *Job Discrimination* § 2294 (2022). Claims for and methods of proving systemic disparate treatment claims are discussed in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 334-39, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).

allegedly hostile acts were not directed toward or witnessed by each plaintiff. *See Berryman*, 669 F.3d at 717-19.

Plaintiffs also argued that Kentucky law employed a flexible "totality of the circumstances" approach to analyzing whether a work environment was hostile rather than analyzing each individual's circumstances separately, citing *Lumpkins*, 157 S.W.3d at 605. They contended their claims were appropriately joined based on commonality of their assertions of hostile work environment – pointing out all ten plaintiffs asserted a hostile work environment based on retaliation and seven plaintiffs also alleged a racially hostile work environment.

In granting summary judgment for LFUCG on Count XI, the trial court interpreted *Berryman* as not allowing the plaintiffs to create a separate joint legal claim based on all of their individual allegations – especially without proof that they were all aware of each other's experiences.[41]

---

[41] In granting LFUCG summary judgment on Count XI, the trial court stated:

> Plaintiffs' Count XI improperly combines all the Plaintiffs [sic] claims of hostile work environment into a claim that LFUCG had created a hostile work environment through their patterns and practices. However, under the analysis of *Berryman*, the Plaintiffs can properly aggregate the facts under each individual Plaintiff's claim if they knew of each other's experiences. As the *Berryman* opinion describes, they cannot, however, create a separate legal claim using all of the claims of all the Plaintiffs, without regard to whether they knew of each other's experiences. *Id*. Ross and Cowherd have failed to establish they were aware of the facts supporting claims involving other plaintiffs. Thus, their claims under Count XI fail and LFUCG is entitled to judgment as a matter of law.

(Ross/Cowherd Summary Judgment, p. 16.) The trial court did not explicitly discuss Count XI in its orders granting LFUCG summary judgment on the other Appellants' claims.

Appellants generally argue in their briefs that they alleged a pattern or practice of discrimination, retaliation, and reprisal; and that the trial court erred in granting summary judgment to LFUCG on Count XI. Without further discussion, they simply cite case law including *Berryman*, 669 F.3d 714, and *McCullough*, 123 S.W.3d 130 to support their allegations of error.[42]

In *McCullough*, our Supreme Court expressed no disapproval about the trial court's allowing the sole plaintiff to present evidence of not being promoted several times outside the statute of limitations as part of showing a pattern or practice of retaliation. *Id.* at 135-36. So, it seemingly approved the decision to admit that evidence – of incidents directly affecting the sole plaintiff – to show a pattern or practice of retaliation.[43] But *McCullough* did not pose any

---

[42] Appellants do not specifically argue any error in dismissing any claim for systemic disparate treatment nor in not employing the burden-shifting approach applicable to systemic disparate treatment claims referred to as the pattern or practice method of proof. *See generally Teamsters*, 431 U.S. at 324, 97 S. Ct. at 1848.

[43] In a case involving multiple plaintiffs, this Court upheld a judgment based on a jury verdict in plaintiffs' favor on claims of racially hostile work environment and held that challenged evidence was properly admitted for purposes including to show: "a pattern and practice of adverse treatment, racial hostility, discrimination and retaliation – a purpose approved by our Supreme Court." *United Parcel Service, Inc. v. Barber*, 557 S.W.3d 303, 311 (Ky. App. 2018) (citing *McCullough,* 123 S.W.3d at 135-36). Other than noting this challenged evidence also showed that "incidents of racial animus" were brought to the employer's attention and that it undermined any defense of the employer's exercising reasonable care to prevent and correct harassment, our analysis in *Barber* does not discuss the challenged evidence in detail. *Id.* at 311. Notably, *Barber* does not specifically discuss whether and under what circumstances the individual plaintiffs were entitled to consideration of evidence of harassing acts directed toward their co-plaintiffs to support their own hostile work environment claims.

issues about whether multiple plaintiffs in the same lawsuit could obtain aggregated consideration of all evidence of harassing acts directed at all of them for summary judgment purposes – unlike these appeals or the *Berryman* case cited by Appellants.

According to *Berryman*, "a plaintiff does not need to be the target of, or a witness to harassment in order for us to consider that harassment in the totality of the circumstances; **but he does need to know about it**." 669 F.3d at 718 (emphasis added). The Sixth Circuit majority declined to presume that all plaintiffs were aware of all harassing conduct not directed to them individually – even offensive displays placed in communal areas. But it indicated that direct evidence of secondhand awareness of harassment towards others of the same protected class could be considered to support hostile work environment claims.[44] *Id*. at 719-20. Ultimately, it affirmed the trial court's denial of aggregated review of all co-plaintiffs' evidence of harassment for summary judgment purposes based on a lack of evidence – such as deposition testimony or written documents – showing that all plaintiffs were aware of allegedly harassing acts directed towards their co-plaintiffs. *Id*. at 720.

---

[44] Citing other Sixth Circuit authority (*Quanex*, 191 F.3d at 661), this Court has similarly recognized that evidence of secondhand awareness of harassment directed towards others of the same protected class should be considered to support hostile work environment claims. *See Morton*, 2019 WL 3059899, at *4; *Yancey*, 2004 WL 323352, at *6.

While Appellants' argument about why the trial court erred in dismissing Count XI is not a model of clarity, each Appellant was entitled to consideration of evidence of acts directed at other Appellants to support his/her individual claims. This is consistent with our Supreme Court's approval of broadly admitting evidence of a pattern or practice of discrimination and/or retaliation in *McCullough*. This also follows its directive in *Lumpkins* that "individual circumstances" should not be "disaggregated" and that incidents should not be assessed in isolation but together to determine whether a hostile work environment was created. 157 S.W.3d at 605.

As the trial court discussed Count XI as a hostile work environment claim, we need not reach LFUCG's argument that Appellants could not succeed on claims of systemic disparate treatment or disparate impact. Appellants denied making these types of claims in trial court proceedings and asserted that Count XI was a hostile work environment claim.

We do not recognize any novel type of joint or collective hostile work environment claim in this non-class action. But we agree with Appellants' assertion the trial court must consider evidence of acts of harassment directed at other employees of the same protected class – especially those which they testified to being aware of – to support their individual claims of hostile work environment. *See, e.g.*, *Lumpkins*, *Berryman*, *Quanex*. So, the trial court erred in summarily

dismissing Count XI and we reverse its summary judgment on Count XI, as well as the summary judgments granted on each Appellant's other claims.

Any other arguments or issues raised in the briefs which we have not discussed in this lengthy Opinion have been deemed to lack merit or relevance to our resolving these appeals.

## CONCLUSION

For the reasons stated herein, we reverse and remand for further proceedings in conformity with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Debra Ann Doss
William L. Davis
Lexington, Kentucky

BRIEFS FOR APPELLEE:

Robert L. Roark
Lexington, Kentucky